**CENTRAL TELECOMMUNICATIONS, INC., Plaintiff,**

**v.**

**TCI CABLEVISION, INC., Community Telecommunications, Telecommunications, Inc., Defendants.**

**No. 83–4068–CV–C–5.**

United States District Court, W.D. Missouri, C.D.

June 5, 1985.

See also 589 F.Supp. 85.

R. Lawrence Ward, G. Stephen Long, Thomas J. Whittaker, Shughart, Thomson & Kilroy, Kansas City, Mo., for plaintiff.

Harold R. Farrow, Richard Moore, Omer Rains, Farrow, Schildhause, Wilson & Rains, Oakland, Cal., for defendants.

ORDER

SCOTT O. WRIGHT, Chief Judge.

Pending before the Court are the following post-trial motions: (1) defendants' motion for judgment *non obstante veredicto;* (2) defendants' alternative motion for a new trial; (3) defendants' motion for clarification of the judgment; (4) plaintiff's motion for enhancement of its attorney's fees; and (5) defendants' motion for a stay of execution pending appeal. For the reasons set forth below, the Court will make the following rulings: (1) defendants' motion for j.n.o.v., alternative motion for a new trial, and motion for a stay of execution will be overruled; (2) defendants' motion for clarification will be sustained and the judgment in this case will be amended to preclude the possibility of double recovery by plaintiff; and (3) plaintiff's motion for enhancement of its attorney's fees will be overruled.

## I. Background

On January 22, 1985, the jury returned verdicts against defendants of $10,800,000.00 on each of plaintiff's antitrust claims,[1] and $10,800,000.00 for actual damages and $25,000,000.00 for punitive damages on plaintiff's state law claim for tortious interference with a business expectancy.[2] These verdicts were rendered by an extremely attentive jury at the conclusion of a thirty-one day trial.

Plaintiff's claims arose out of a dispute over cable television franchise rights in Jefferson City, Missouri.[3] In 1978, defendants[4] (hereinafter collectively referred to as "TCI") bought the only existing cable

1. Plaintiff successfully submitted two antitrust claims to the jury: actual monopolization and conspiracy to unreasonably restrain trade. The $10,800,000.00 award is the amount of the verdict before trebling.

2. Plaintiff concedes that it cannot recover both treble damages on its antitrust claims and punitive damages on its tortious interference claim. *See Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1283–84 (8th Cir.1981); *see also* page 910 *infra.*

3. Jefferson City provides a very attractive market for cable television. Because the city is nestled in a hilly region on the south bank of the Missouri River, broadcast television reception is extremely poor. Only one broadcast television station is located in the city. As a result of these factors, cable television's market penetration has been extremely high in Jefferson City.

4. There were three defendants in this case: TCI Cablevision, Inc.; Community Telecommunications, Inc.; and Telecommunications, Inc. TCI Cablevision and Community Telecommunications are wholly-owned subsidiaries of Telecommunications, Inc. According to the evidence in this case, the parent corporation controls approximately 1,000 local cable systems and is the largest cable television company in the United States. The evidence also showed that the corporate organization of the three defendants was extremely loose. Employees authorized to act on behalf of one of the companies in reality acted on behalf of all three companies. Consequently, the jury was instructed to treat all three defendants as one entity for the purpose of returning its verdicts.

television franchise[5] in Jefferson City. By its terms, the franchise which TCI purchased was scheduled to expire in April, 1981.

As is customarily done in cities across the country, Jefferson City initiated an RFP[6] process to solicit bids to determine the recipient of the next cable television franchise. Being the incumbent operator, defendants naturally enjoyed the inside track in the competition for the next franchise. Nevertheless, city officials remained open to the option of refusing to renew TCI's franchise, particularly in view of mounting consumer dissatisfaction with existing service.

In 1980, a group of local investors formed the plaintiff company (hereinafter referred to as "Central") for the express purpose of competing for a cable television franchise in Jefferson City. Aware of the public's dissatisfaction with the incumbent operator, Central began arranging financing and responded to the city's RFP by offering expanded services for less money. In contrast, defendants refused to participate directly in the RFP process. Instead, TCI undertook various tactics designed to ensure that it could not be displaced as the sole cable television franchisee in Jefferson City. Many of these activities were performed by Paul Alden, a "troubleshooter" in defendants' franchise renewal department. For example, Mr. Alden threatened to destroy the career of Elmer Smalling, a consultant who was evaluating the RFP responses for the city. Mr. Alden also attempted to intimidate city officials by threatening to flood the Jefferson City market with satellite dishes if defendants' franchise was not renewed. This threat, as it turned out, was a complete fraud: Mr. Alden represented that his company had exclusive control over the distribution of satellite dishes in the Jefferson City area when, in fact, his company had never participated in the satellite dish business. In addition, TCI sent shock waves through the Jefferson City community by announcing to the public that all cable television services would be terminated unless its franchise was renewed. Defendants applied additional pressure on city officials by refusing to pay the city approximately $60,000.00 in past-due franchise fees unless and until their franchise was renewed. Finally, on March 16, 1981, defendants filed a multi-count lawsuit against the city and began to engage the city in protracted litigation. The gravamen of this lawsuit was the claim that the First Amendment prohibited the city from terminating an entrenched cable television operator's right to provide cable services in the community.

Notwithstanding TCI's efforts to subvert the RFP process and retain its entrenched position, city officials continued to review the bids submitted by plaintiff and other applicants. The chief competitors in the RFP process were Central and Teltran, a cable television operator based in Columbia, Missouri. The city's consultant, Elmer Smalling, rated Central and Teltran equally. In November, 1981, however, Teltran withdrew its application, thus leaving plaintiff as the best candidate for a new franchise. On January 25, 1982, the city council of Jefferson City passed an ordinance authorizing the city attorney to begin negotiating franchise documents with plaintiff. While these negotiations were being conducted, defendants continued pressuring the city to renew its franchise.

5. A "franchise" is the term commonly used to describe the license issued by a local governmental entity to a cable television operator to build and maintain a cable system in the community. The original purpose of licensing cable systems stemmed from the fact that a cable operation, like any other public utility, needs easements across both public and private property in order to gain access to individual households. Thus, in the interest of preserving the integrity of the public domain, a licensing or franchising process developed whereby a city could demand assurances of responsible behavior from a prospective cable operator.

6. The term "RFP" is shorthand for "Request for Proposals." An RFP is, in essence, an advertisement for bids. In its RFP, the city sets forth the minimum terms and specifications for a cable television system which all prospective operators are expected to meet.

On April 16, 1982, after a series of secret meetings between TCI and various city officials, Mayor Hartsfield announced that an agreement had been reached whereby the city would renew defendants' franchise and defendants would dismiss their lawsuit against the city. Nevertheless, on April 20, 1982, the city council voted by a 7–3 majority to award a non-exclusive franchise to plaintiff. Mayor Hartsfield promptly vetoed the ordinance granting a franchise to plaintiff. The next item on the council's agenda was a proposed ordinance which would renew defendants' franchise. The council was deadlocked at a 5–5 vote. The mayor cast the tie-breaking vote and, as a result, TCI retained its position as the only cable television operator in Jefferson City.

Contending that it had been wrongfully deprived of a franchise, Central brought the instant lawsuit. TCI counterclaimed. After thirty-one days of trial, the Court granted plaintiff's motion for a directed verdict on defendants' counterclaims. Central submitted its case to the jury on three theories: (1) conspiracy to unreasonably restrain trade; (2) actual monopolization; and (3) tortious interference with a business expectancy. The jury found for plaintiff under each theory. The post-trial motions presently before the Court ensued.

## II. Motion for J.N.O.V.

TCI's motion for j.n.o.v. advances two primary arguments for overturning the jury's verdicts. Only these two arguments will be addressed herein; the other grounds raised by defendants are rejected as being without merit.

### A. Noerr-Pennington Defense

The first substantial argument raised by defendants is that all of their allegedly wrongful conduct was protected activity within the purview of the *Noerr-Pennington* doctrine. There are two distinct components of the *Noerr-Pennington* doctrine, both of which are based on the notion that civil liability should not be imposed on persons for exercising their First Amendment right to petition the government.[7] The first prong of the *Noerr-Pennington* defense is the protection of legitimate efforts to lobby or influence public officials with respect to political action, even if those efforts are designed to eliminate competition.[8] The second strand of the *Noerr-Pennington* defense is the protection of genuine efforts to seek redress through the judicial process, even if the outcome of such litigation is certain to affect or eliminate competition.[9] Both the lobbying and litigation aspects of the *Noerr-Pennington* doctrine are implicated in the instant case.

#### 1. *Litigation*

Under the *Noerr-Pennington* doctrine, participation in the judicial process cannot be asserted as a basis for civil antitrust liability "unless it may be characterized as a sham cover for what is really just an attempt to directly interfere with

7. Although the *Noerr-Pennington* defense is most often asserted against antitrust claims, it is equally aplicable to many types of claims which seeks to assign liability on the basis of the defendant's exercise of its First Amendment rights. *See In re IBP Confidential Business Documents Litigation,* 755 F.2d 1300, 1312 (8th Cir. 1985); *Westborough Mall v. City of Cape Girardeau,* 693 F.2d 733, 747 (8th Cir.1982); *First National Bank v. Marquette National Bank,* 482 F.Supp. 514, 524–25 (D.Minn.1979), *aff'd,* 636 F.2d 195 (8th Cir.1980), *cert. denied,* 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981).

8. *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961); *see, e.g., First Am. Title Co. of S. Dakota v. South Dakota Land Title Ass'n,* 714 F.2d 1439, 1445–47 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Westborough Mall v. City of Cape Girardeau,* 693 F.2d at 745–46; *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1195 (8th Cir.1982); *see generally* Annot., 71 A.L.R.Fed. 723 (1985).

9. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–511, 92 S.Ct. 609, 611–612, 30 L.Ed.2d 642 (1972); *see, e.g., First Am. Title Co. of S. Dakota v. South Dakota Land Title Ass'n,* 714 F.2d at 1448; *Alexander v. National Farmers Org.,* 687 F.2d at 1200.

the business relations of a competitor." [10] The fundamental question underlying the issue of whether a lawsuit was a mere sham and thus unprotected conduct is one of intent.[11] In the instant case, plaintiff introduced evidence concerning defendants' 1981 lawsuit against Jefferson City wherein defendant had sought to enjoin the city from displacing it as a cable television operator. At first, plaintiff attempted to show that this lawsuit fell within the sham exception to the *Noerr-Pennington* doctrine.[12] As the trial progressed, however, plaintiff apparently had doubts about the sufficiency of the evidence to support a finding that the 1981 lawsuit was a sham and, consequently, withdrew the issue from the jury's consideration. The withdrawal instruction expressly directed the jury that it could not consider defendants' 1981 lawsuit against Jefferson City to have been unlawful conduct. This withdrawal instruction adequately informed the jury that defendants' 1981 lawsuit was protected litigation under the *Noerr-Pennington* doctrine.[13] It must be assumed that the jury followed the Court's instructions and did not rely on the 1981 lawsuit in arriving at its verdicts. Defendants' arguments to the contrary [14] are contradicted by the plain language of the jury instructions.

2. *Lobbying*

As noted above, the lobbying prong of the *Noerr-Pennington* doctrine extends a cloak of immunity from civil liability to legitimate efforts to influence public officials with respect to political action.[15] It bears emphasis, however, that only *legitimate* lobbying efforts are protected; conduct that extends beyond "traditional political activity" may not be protected.[16] Thus, when accompanied by illegal or fraudulent actions, efforts to influence public officials are not exempt under the *Noerr-Pennington* doctrine.[17]

In the instant case, defendants contend that the jury's verdicts should be overturned because all of their allegedly anticompetitive conduct was protected activity within the *Noerr-Pennington* doctrine. The Court must disagree. The record clearly contained sufficient evidence to support the jury's finding that the wrongful conduct of defendants was either "sham lobbying" or not lobbying at all. For example, Paul Alden's threat to ruin the career of Elmer Smalling simply cannot be characterized as "lobbying" in the first instance. Smalling was not an elected public official, nor did his role in the city's RFP process involve political action; instead, he was merely a consultant to the city whose job was to evaluate a mass of technical information. In addition, the jury clearly was justified in believing that Paul Alden's threat to flood the Jefferson City market with satellite dishes was not legitimate lobbying activity; instead, it was pure fraud. As Alden admitted during his deposition, he knew that neither he nor his former employer had ever been in the satellite dish

**10.** *Alexander v. National Farmers Org.,* 687 F.2d at 1200; *see generally Razorback Ready Mix Concrete Co. v. Weaver,* 761 F.2d 484, 486–488 (8th Cir.1985).

**11.** *See Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d 288, 297 (8th Cir.1978).

**12.** *Cf. Alexander v. National Farmers Org.,* 687 F.2d at 1200–04 (litigation designed to harass and intimidate third parties in order to directly interfere with business relations of plaintiff held a mere sham).

**13.** Even though a lawsuit is "exempt conduct" under the *Noerr-Pennington* doctrine, it nevertheless may be considered "to the extent it tends to show the purpose or character of other, non-exempt activity." *Alexander v. National Farmers Org.,* 687 F.2d at 1196. The jury was so instructed in the instant case. *See* Instruction No. 15.

**14.** *See* Suggestions in Support of Defendants' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, For a New Trial, at pp. 10–11.

**15.** *See* note 8 *supra; see also Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1566–68 (5th Cir.1984); *City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1180–81 (8th Cir.1982).

**16.** *Westborough Mall v. City of Cape Girardeau,* 693 F.2d at 746.

**17.** *Id.*

business. Finally, TCI's refusal to pay past-due franchise fees to the city unless the city renewed its franchise had nothing to do with "genuine" political activity; instead, it was nothing short of commercial blackmail. Although there was conflicting evidence on the issue, the jury's determination that TCI had strayed beyond the bounds of legitimate lobbying activity is well-supported by the record. Accordingly, defendants' contention that all of its conduct was protected by the *Noerr-Pennington* doctrine must be rejected.

### B. First Amendment Defense

The second frontal assault on the verdict is the argument that defendants cannot be held liable for retaining their position in the Jefferson City cable television market because the First Amendment afforded them an absolute right to continue their cable television operation free from government interference. Defendants claim that they are entitled to First Amendment protection because their sole function is to transmit information to the public. While defendants admit that they do not produce original programming, they contend that their role as a conduit for news, entertainment, and advertising is analogous to that of *Reader's Digest.*

Although it doubts that TCI's First Amendment rights are coextensive with those of the print media,[18] this Court acknowledges that cable television operators are entitled to *some* measure of First Amendment protection. For example, governmental entities may not discriminate against a cable television operator on the basis of programming content.[19] Nor may a local governmental body artificially limit the number of cable television operators in a given market.[20] Nevertheless, it has long been the law that the First Amendment does not afford absolute immunity from antitrust liability to members of the communications industry.[21] Thus, if one cable television operator conspires or engages in predatory conduct for the purpose of eliminating its competitors, it will be liable in an antitrust lawsuit to the same extent as any other competitor in any other industry.

In essence, defendants' First Amendment argument is that they were justified, as a matter of law, in resisting Jefferson City's RFP process because the city could not constitutionally force an established cable television franchisee to cease operation at the conclusion of the franchise term.[22] Defendants further contend that, even if the Jefferson City market could support only one cable system, the city could not constitutionally displace the incumbent franchisee with a new franchisee; instead, defendants argue, they had an absolute First Amendment right to continue their operation either with or without a franchise from the city.[23] Thus, defendants' position is that Jefferson City's RFP process was

18. *See Omega Satellite Products v. City of Indianapolis,* 694 F.2d 119, 128 (7th Cir.1982); *Community Communications Co. v. City of Boulder,* 660 F.2d 1370, 1377–80 (10th Cir.1981); *Berkshire Cablevision of Rhode Island v. Burke,* 571 F.Supp. 976, 985 (D.R.I.1983).

19. *See Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396, 1401 (9th Cir.1985); *Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 127; *Community Communications Co. v. City of Boulder,* 660 F.2d at 1376; *Midwest Video Corp. v. FCC,* 571 F.2d 1025, 1052–57 (8th Cir.1978), *aff'd on other grounds,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979).

20. *See Tele-Communications of Key West, Inc. v. United States,* 757 F.2d 1330, 1336–38 (D.C.Cir. 1985); *Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d at 1411.

21. *Associated Press v. United States,* 326 U.S. 1, 19–20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945).

22. *Cf. Carlson v. Village of Union City,* 601 F.Supp. 801, 809–12 (W.D.Mich.1985) (dismissing First Amendment claim of cable television operator whose franchise had been revoked by local governmental entity).

23. The inescapably ironic spectre implicit in this argument is that a cable system—such as TCI's system in Jefferson City—which was allowed to expand and prosper for years under the protective mantle of an exclusive franchise can now use the First Amendment as a shield to ward off competition and maintain its entrenched position.

illegal as a matter of federal constitutional law and that, consequently, all of TCI's efforts to retain its place in the Jefferson City cable television market were lawful.[24]

If the Court agreed with defendants' argument in its entirety, plaintiff's complaint would have been dismissed a long time ago. However, defendants' argument misstates the applicable law and misperceives the theory of the case that was submitted to the jury.

1. *The First Amendment and Cable Television*

There are two primary areas of interface between cable television and the First Amendment. First, there is the matter of governmental regulation of programming content. It is well-settled that, absent some compelling governmental interest, such content regulation is impermissible.[25] This aspect of the First Amendment was not implicated in the instant case; there was simply no evidence that Jefferson City engaged in content-based regulation.

The second area of interface between cable television and the First Amendment surrounds the franchising process whereby local governmental entities regulate access to cable television markets. This area has provided fertile ground for litigation in recent years.[26] The only legal principle on which virtually all courts have agreed is that local governmental entities have *some* authority to regulate cable television operators in the interest of minimizing the inevitable disruption of the public domain occasioned by the installation of cable television systems.[27] In addition, it is noteworthy that federal law has acknowledged the authority of a local governing body to "award one or more franchises within its jurisidiction." [28] Thus, it appears safe to say that cities, such as Jefferson City, enjoy the power to license cable television operators within their geographic spheres of influence.

A more difficult problem arises, however, when a local governmental entity seeks to place a limit of the number of franchisees in its jurisdiction. Although the law in this area is far from settled, the emerging answer appears to be that the

24. In support of its position, TCI draws an analogy to the print media: just as the government has no authority to dictate who may or may not run the sole newspaper in a community, *see Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 254–58, 94 S.Ct. 2831, 2837–39, 41 L.Ed.2d 730 (1974), TCI insists that a city may not decide who may operate the sole cable television system in a given market. As will be discussed *infra,* there are two fundamental flaws in defendants' argument: (1) the law applicable to cable television differs from the law applicable to print media in that, to the extent that a given market can support only one cable system, a city does have the authority to select the best applicant for a *de facto* exclusive franchise; and (2) regardless of whether or not a market can support more than one system, a cable operator cannot use the First Amendment as a shield when it engages in anticompetitive and predatory conduct for the purpose of maintaining its monopoly power over the market.

25. *E.g., Cruz v. Ferre,* 755 F.2d 1415 (11th Cir. 1985); *Videophile, Inc. v. City of Hattiesburg,* 601 F.Supp. 552 (S.D.Miss.1985).

26. *See, e.g., Tele-Communications of Key West, Inc. v. United States,* 757 F.2d at 1335–39; *Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d at 1401–11; *Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 125–29; *Community Communications, Inc. v. City of Boulder,* 660 F.2d at 1375–80; *Carlson v. Village of Union City,* 601 F.Supp. at 809–812; *Century Federal, Inc. v. City of Palo Alto,* 579 F.Supp. 1553, 1561–65 (N.D.Cal.1984); *Hopkinsville Cable TV, Inc. v. Pennyroyal Cablevision, Inc.,* 562 F.Supp. 543, 547 (W.D.Ky.1982).

27. *E.g., Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d at 1406; *see also Community Communications, Inc. v. City of Boulder,* 660 F.2d at 1377–78. ("[s]ome form of permission from the government must, by necessity, precede such disruptive use of the public domain").

28. Cable Communications Policy Act of 1984, Pub.L. No. 98–549, § 621(a)(1) (1984); *see also id.* § 621(b)(1) (prohibiting operation of cable television system without a franchise); H.R. Rep. No. 934, 98th Cong., 2d Sess. 59, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4696 (Cable Communications Policy Act of 1984 "grants to the franchising authority the discretion to determine the number of cable operators to be authorized to provide service in a particular geographic area").

grant of a single cable franchise is permissible only if the physical and economic conditions of the relevant market give rise to a "natural monopoly" situation.[29] The theory is that, where physical and economic factors render a market incapable of accommodating more than one cable television system, the local governing body is in the best position to determine which proposed system offers the best service to the public for the lowest cost. Since only one operator can survive in the market, it makes sense to allow the local government to choose the best applicant.[30] Otherwise, as a result of the enormous start-up costs of constructing a cable television system,[31] no one would dare compete in a natural monopoly-type market with an incumbent operator even if the incumbent was providing poor service to the consuming public. The initial investment would be too great to risk on the hope of wresting the entire market away from the incumbent. Thus, the incumbent operator would remain in a firmly entrenched position regardless of the quality of its system. Consequently, in a natural monopoly situation, the First Amendment should tolerate a franchising process whereby a city may periodically award an exclusive franchise to the applicant which offers the best package to the public.[32]

On the other hand, if a given cable television market does not have natural monopoly characteristics, the justification for limiting the number of franchisees disappears. If the market can support more than one cable system, it no longer makes sense to force prospective operators to compete for a single franchise. Nor does it make sense to allow the local governmental body to act as the guardian of the public's interest. Instead, the surest method of determining which operator best fulfills the needs of each consumer is to grant licenses to all qualified applicants and to let them compete in the marketplace.

In a nutshell, then, the determinative factor with respect to a city's power to restrict the number of cable television franchisees is whether economic and physical

29. *See Tele-Communications of Key West, Inc. v. United States,* 757 F.2d at 1338; *Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 127; *Community Communications, Inc. v. City of Boulder,* 660 F.2d at 1378–80. *But cf. Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d at 1404–05. A "natural monopoly" situation exists where "a market has room for only one firm." *Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 125; *see generally Byars v. Bluff City News Co.,* 609 F.2d 843, 853 n. 27 (6th Cir.1979).

30. Allowing local governmental entities to select the most qualified applicant is the most logical allocation of authority for two reasons. First, because cable systems can operate profitably only in areas of relatively high population density, each system typically serves only one community. It would be extremely unusual for a cable system to serve the rural area situated between two towns. Consequently, the local governing body is not too small to handle the job of regulating cable operators. Second, the local governing body is not too big for the job. In contrast to a state or federal regulatory body, which likely would respond to the idiosyncracies of a particular community with bureaucratic insensitivity, local governmental entities are ideally sized to meet the needs of their constituents.

31. *See Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 126; *Berkshire Cablevision of Rhode Island v. Burke,* 571 F.Supp. at 986.

32. Such a scheme acknowledges that a local governmental entity is not a competitor of cable operators, but "a representative of the potential customers of these companies." *Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 125–26. Although TCI insists that the First Amendment was designed to allow each individual customer to choose which cable system to subscribe to, TCI's concern for the rights of consumers rings hollow. In a natural monopoly-type market, individual consumers have no choice among competing systems. Thus, the franchising process actually enhances the power of consumers by allowing a local governing body to engage in a form of collective bargaining with franchise applicants. Through the franchising process, consumers realize two principal advantages. First, the franchise agreement imposes certain obligations on the cable operator which must be performed upon penalty of termination. *See Carlson v. Village of Union City,* 601 F.Supp. at 812. Second, the fact that a franchise has an expiration date gives the franchisee incentive to provide good service or risk losing its bid for renewal. Otherwise, as the evidence showed in the instant case, the incumbent operator is prone to become lackadaisical.

conditions in the relevant market give rise to a "natural monopoly" situation. If the market has room for only one firm, it makes sense to require all prospective franchisees to compete "for" the market and to allow the local governing body to make the decision as to which cable system will best serve its constituents. But, if a market has room for more than one cable system, a city's efforts to artificially limit the number of operators would constitute a prior restraint in violation of the First Amendment.

2. *The Theories of the Case*

In order to obviate TCI's First Amendment concerns, the jury instructions in this case were carefully tailored to ensure that the jury could not return a verdict for plaintiff under circumstances where defendants had a valid First Amendment defense to plaintiff's claims. As stated in Instruction No. 20, plaintiff submitted its case under two divergent theories. First, the jurors were instructed that if they found that physical and economic conditions in the Jefferson City cable television market gave rise to a natural monopoly, they must focus on whether defendants engaged in anti-competitive or predatory conduct with respect to competition *for* the market. Second, the jurors were instructed that if they found that a natural monopoly situation did not exist as of April, 1982, they must focus on whether defendant engaged in anti-competitive or predatory conduct with respect to competition *in* the market. Assuming that the jury heeded this "fork-in-the-road" instruction as well as all other instructions, it is apparent that all questions of fact underlying defendants' First Amendment argument were considered and resolved by the jury.[33]

(a) *Natural Monopoly Theory*

Under the "fork-in-the-road" jury instruction described above, the jury was permitted to consider whether market conditions gave rise to a natural monopoly situation. If it found that a natural monopoly situation existed, the jury was further instructed to determine whether defendants committed the offense of actual monopolization with respect to competition *for* the market. In other words, under this submission the jury was told to consider whether defendants violated the antitrust laws with respect to competition *for* the exclusive right to serve the Jefferson City market.[34]

This submission is not objectionable on First Amendment grounds. As noted above, a local governmental entity has the authority to select an exclusive franchisee when: (1) the local market has room for only one cable television system; and (2) the governing body makes its selection in the public interest.[35] If it proceeded under this branch of the "fork-in-the-road" instruction, the jury necessarily would have found that the Jefferson City market had room for only one cable system. Moreover, to ensure that the jury focused on "the public interest" as the standard by which the city awarded the franchise, the Court specifically instructed the jury that anti-competitive or predatory activity is conduct which operates to the detriment of purchasers or consumers. Thus, in order to return a plaintiff's verdict under this theory, the jury necessarily would have made two factual findings: (1) that the Jefferson City cable television market could only support one franchisee; and (2) that, in retaining their position as the sole franchisee in the Jefferson City market,

33. According to the Court's research, this is the first case in which the question of whether a natural monopoly situation exists with respect to a cable television market has been submitted to a jury. *Cf. Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 125–28; *Carlson v. Village of Union City,* 601 F.Supp. at 810 n. 8. The Court is convinced that treating the natural monopoly issue as a question of fact was proper; in each case, the issue will turn on a variety of particularized factors ranging from the population density of a given community to the age and height of its utility poles.

34. *See Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 127.

35. *See* notes 26–32 and accompanying text *supra.*

defendants acted to the detriment of the interests of the consuming public. Given these two factual determinations, plaintiff's "natural monopoly" theory of the case easily withstands defendants' First Amendment attack.

(b) *Open Market Theory*

TCI's First Amendment assault on plaintiff's "open market" theory of the case is more difficult to analyze. Under the second branch of the "fork-in-the-road" instruction described above, the jury was permitted to find that the Jefferson City market had room for more than one cable television franchise. If it found that the market had room for more than one franchise, the jury was further instructed to determine whether defendants committed the offense of actual monopolization with respect to competition *in* the market. In other words, under this submission the jury was told to focus not on competition between rival cable television operators for a single franchise, but on head-to-head competition *in* the marketplace. This instruction effectively warned the jury that, notwithstanding the city's intention to award only one franchise, it could not assume that only one franchise should have been awarded. At all times, it was within the province of the jury to determine whether the physical and economic characteristics of the Jefferson City market permitted head-to-head competition.

Defendants insist that plaintiff should not be allowed to recover under its "open market" theory for two reasons. First, defendants argue that, once the jury determined that Jefferson City had room for more than one cable system, the city's RFP process was illegal as a matter of law. Second, defendants contend that the evidence of plaintiff's unwillingness to compete head-to-head in the marketplace was so overwhelming as to preclude recovery under an "open market" theory.

Despite the superficial appeal of these two arguments, neither can withstand close scrutiny. It is true that TCI's publicly stated position in Jefferson City and at trial was that they were willing to compete head-to-head with any competitor. In accordance with this public posture, defendants characterized the city's RFP process as an illegal auction for an exclusive franchise and refused to participate in the RFP. In addition, defendants filed suit against the city in 1981, claiming that any attempt to revoke or terminate its right to provide cable television programming would be violative of the First Amendment. Thus, on the surface, defendants' contention that it was at all relevant times a scrupulous proponent, not an opponent, of open market competition appears to be true.

On closer inspection, however, it becomes apparent that the sincerity of TCI's publicly announced position was subject to legitimate dispute. At trial, there was evidence that defendants had taken a contrary position by defending a city's right to grant an exclusive franchise in other communities. In addition, notwithstanding defendants' criticism of plaintiff's efforts to obtain a *de facto* exclusive franchise from the city, there was substantial evidence that defendants were engaged in a calculated scheme to prevent plaintiff from entering the Jefferson City market and to maintain a *de facto* exclusive franchise for themselves.

Two factual findings implicit in the jury's verdicts confirm that TCI's endorsement of head-to-head competition lacked sincerity. First, the jury's finding that defendants possessed monopoly power—that is, the power to exclude competition in the Jefferson City market—contradicts TCI's argument that the city was solely responsible for deciding who could operate a cable system within that jurisdiction.[36] Second, the jury's finding that "defendants caused Jefferson City to terminate the business ex-

36. The verdict director on plaintiff's actual monopolization claim, Instruction No. 22, required as its second element that "defendants possessed or acquired monopoly power over the Jefferson City cable television services market." In turn, Instruction No. 18 defined "monopoly power" as "the power to exclude competition or control prices in the relevant product market or product sub-market."

pectancy of plaintiff"[37] directly contradicts defendants' argument that they were not responsible for keeping plaintiff out of the Jefferson City cable television market. Undisputed evidence showed that, on April 20, 1982, the city council voted to grant an ostensibly nonexclusive franchise to plaintiff. If defendants were truly sincere about competing head-to-head with plaintiff in market, there was no need for them to cause the Mayor of Jefferson City to veto plaintiff's franchise. All that defendants needed to do was to press for a nonexclusive franchise of their own. Yet, the jury specifically found that TCI *caused* the city to withhold a franchise from plaintiff. Thus, even under an "open market" theory, there clearly was sufficient evidence to support the conclusion that defendants violated the antitrust laws by effectively barring plaintiff from the Jefferson City cable television market.

In sum, it was never necessary for the jury to frontally consider defendants' "First Amendment defense." If the jury had found that the city was solely responsible for artificially limiting the number of franchisees in the Jefferson City market, then *a fortiori* it would have found neither that defendants possessed monopoly power nor that defendants caused the city to veto plaintiff's franchise. Conversely, since the jury found that defendants possessed monopoly power and that defendants caused the city to veto plaintiff's franchise, the Court is compelled to conclude that defendants' "First Amendment defense" is nothing more than a red herring. Simply stated, the jury could not have returned its verdict for plaintiff under an "open market" theory *unless it specifically found that defendants engaged in anti-competitive and predatory conduct with respect to competition in the market.* Defendants had every opportunity to produce evidence and make arguments to convince the jury that plaintiff's exclusion from the Jefferson City market was the result of either the city's efforts to artificially limit the number of franchisees or the plaintiff's unwillingness to compete head-to-head with defendants in the market. Defendants also enjoyed every opportunity to produce evidence and make arguments to persuade the jury that they were at all times in favor of head-to-head competition in the marketplace. If the jury had been swayed by any of these arguments, it would not have found against defendants. In short, the true issue in this case was whether defendants were responsible for plaintiff's exclusion from the Jefferson City market. The jury's conclusion that defendants were the responsible parties completely undermines any attempt to pass the blame on to the city by way of an amorphous "First Amendment defense" in this case.

## III. Motion for a New Trial

In support of its motion for a new trial, TCI asserts myriad grounds for setting aside the jury's verdict. Only seven of the cited grounds will be addressed herein. The balance of the points raised by TCI must be rejected as being without merit.

### A. Opening Statement

First, defendants attack the Court's refusal to allow them to make legal arguments concerning the scope of a cable television operator's First Amendment rights during opening statement. On more than one occasion, TCI's attorney attempted to interject gratuitous and inaccurate legal arguments concerning the First Amendment in his opening remarks. Prompt objections by plaintiff's counsel were sustained.[38]

37. Instruction No. 23 (verdict director on plaintiff's tortious interference claim).

38. Defendants also complain that, in the course of sustaining one of plaintiff's objections, the Court stated that the First Amendment had "nothing to do with this case." If taken literally, this remark would have been incorrect; as noted above, the First Amendment was involved in this case by virtue of the *Noerr-Pennington* defense and in connection with the natural monopoly question. *See* pages 896–903 *supra.* Put in context, however, the true meaning of the Court's remark, as everyone present in the courtroom—including defendants' attorneys—was aware, was that any reference to the First Amendment had no place in an opening statement. Moreover, as the trial progressed, TCI was afforded every opportunity to educate the

The Court's rulings are not subject to serious dispute. Opening statements afford the parties an opportunity to outline what their evidence will be. Legal arguments offered during the course of an opening statement are improper. Accordingly, the Court had no choice but to direct defendants' attorney to refrain from making references to principles of constitutional jurisprudence during his opening statement, particularly where, as here, his characterization of the law was either erroneous or misleading.

B. **Evidentiary Rulings**

TCI's second argument in support of its prayer for a new trial consists of a challenge to various evidentiary rulings by the Court. First, defendants contend that the Court erred in excluding evidence concerning the *"Boulder* case." The Court stands by this ruling. During his examination of a number of witnesses, TCI's attorney attempted to elicit testimony concerning the effect on the instant case of various rulings by the federal district court, the court of appeals, and the United States Supreme Court in the course of litigation between a subsidiary of TCI and the City of Boulder, Colorado.[39] In each instance, defendants' attorney attempted to characterize the *Boulder* case as a landmark establishing an absolute First Amendment right for cable television systems to operate free from local governmental regulation. Upon timely objections by plaintiff's counsel, this evidence was excluded for two basic reasons. First, TCI's characterization of the *Boulder* case was deliberately misleading. Of the three appellate decisions in the *Boulder* litigation, only one[40] contained any substantive discussion of the First Amendment implications of local governmental cable regulation, and that opinion does not merit characterization as a landmark decision establishing an absolute First Amendment right to operate a cable television system.[41] Second, the Court was concerned that any probative value to be derived from evidence concerning the *Boulder* case was easily outweighed by the potential risk of misdirection and confusion such an inquiry would entail. For example, when defendants offered to introduce a certified copy of a consent decree entered into by the city and the cable operator in the *Boulder* case, this offer was rejected on the ground that the jury might well misperceive the importance of such a document and give it undue weight.

Another evidentiary ruling challenged by TCI is the Court's exclusion of the expert testimony of Arthur Lee. Mr. Lee is a Vice President of Operations for TCI. Because Mr. Lee was never designated as an expert in response to plaintiff's interrogatory under Fed.R.Civ.P. 26(b)(4)(A)(i), plaintiff assumed that he would be used by defendants as a lay witness only. In the course of examining Mr. Lee at trial, defendant's counsel began asking the witness about the pole attachment and pole replacement costs that would be involved in building a brand new cable television system in Jefferson City. Plaintiff's objection to this testimony was sustained on the ground that this was a subject for expert testimony and that Mr. Lee had not been designated as an expert. TCI seeks to overturn this ruling by characterizing

jury with respect to both its *Noerr-Pennington* defense and its claim that it did not act as a monopolist but instead acted as a zealous defender of the First Amendment. Thus, any overstatement by the Court during defendants' opening statement clearly did not taint the jury's verdict.

39. *See Community Communications Co. v. City of Boulder,* 485 F.Supp. 1035 (D.Colo.1980), *rev'd,* 630 F.2d 704 (10th Cir.1981), *rev'd,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *Community Communications Co. v. City of Boulder,* 496 F.Supp. 823 (D.Colo.1980), *rev'd,* 660 F.2d 1370 (10th Cir.1981), *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982).

40. *See* 660 F.2d at 1375–80.

41. To the contrary, the Tenth Circuit overturned a preliminary injunction in favor of the cable operator and remanded the case to the district court, stating that the scope of the cable operator's First Amendment protection was a matter to be developed at trial. *Id.* at 1380.

Mr. Lee as an occurrence witness who merely would have testified "as to his personal knowledge as a veteran in the cable field." [42] Defendants' argument misses the point. Under Fed.R.Evid. 702, a witness may qualify as an expert by virtue of his knowledge, experience, or training. The crucial distinction between lay testimony and expert testimony is that the subject of expert testimony "must be so distinctively related to some science, profession, business, or occupation as to be beyond the ken of the average layman." [43] Viewed in this context, it is readily apparent that Mr. Lee's proffered testimony was expert testimony. According to defendants, the proffered testimony would have dealt with "make-ready costs, pole brackets and utility pole spacing." [44] These topics clearly are beyond the understanding of an ordinary layman. Indeed, defendants contend that Mr. Lee was qualified to give his opinion "based on his extensive experience in the industry and on his knowledge acquired as an executive officer of TCI Cablevision." [45] This statement is, in effect, an admission by TCI that Mr. Lee's testimony concerned a technical subject which only an expert, and not a layman, would not be qualified to address. Therefore, it was proper to exclude Mr. Lee's testimony by reason of defendants' failure to designate him as an expert witness in response to plaintiff's interrogatory under Fed.R.Civ.P. 26(b)(4)(A)(i).

A third evidentiary ruling challenged by TCI which merits discussion relates to the testimony of TCI's expert economist, Mr. Roy Weinstein. Before Mr. Weinstein began testifying, plaintiff's counsel moved to exclude his testimony in its entirety on the ground that he had been reading "daily copy" of the trial transcript in violation of Fed.R.Evid. 615. Mr. Weinstein acknowledged that he had been reading "daily copy." Although it would have been justified in excluding all of Mr. Weinstein's testimony under these circumstances,[46] the Court took a middle position and ruled that Mr. Weinstein could testify concerning any information he had obtained and opinions he had formed before, but not after, he had been deposed by plaintiff in September, 1984. Defendants insist that this ruling was an abuse of discretion. The Court disagrees. Mr. Weinstein's review of daily copy was a clear violation of Fed. R.Evid. 615. If TCI had wanted to qualify Mr. Weinstein as a person whose presence was essential to the presentation of its case within the meaning of the rule, it should have so moved when the rule was invoked at the start of trial. Moreover, the Court believes that its ruling was correct under Fed.R.Civ.P. 26(e)(1)(B), which imposes an affirmative duty on parties to supplement their interrogatory answers concerning the substance of anticipated expert witness testimony; it bears emphasis that Mr. Weinstein was precluded only from testifying with respect to matters of substance which had arisen subsequent to his deposition in September, 1984. Accordingly, the Court stands by this ruling.

The final evidentiary point to be addressed herein concerns the testimony of Clarence Blume. Mr. Blume, a member of the Jefferson City, City Council in the crucial period of 1981–82, was called to testify by plaintiff. As a result of his testimony, the Court for the first time became aware of how deeply involved TCI's lead attorney, Mr. Harold Farrow, had been in TCI's efforts to retain its franchise in Jefferson

42. Suggestions in Support of Defendants' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial, at page 38.

43. *McCormick's Handbook on the Law of Evidence* § 13, at 29 (2d ed. 1972).

44. Suggestions in Support of Defendants' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial, at page 39.

45. *Id.*

46. *See Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372–74 (5th Cir.1981).

City. During Mr. Farrow's cross-examination of Mr. Blume, the attorney and the witness began debating over exactly what had transpired in Jefferson City. When Mr. Blume directed questions at Mr. Farrow, the attorney did not offer any objection or motion to strike the witness' "testimony" as being non-responsive. Instead, much to the Court's astonishment, Mr. Farrow appeared content to answer Mr. Blume's questions. At times, the witness and the attorney began arguing back and forth. On one occasion, the situation had deteriorated to the point where the Court intervened *sua sponte* and directed Mr. Blume to just answer the questions asked. All the while, Mr. Farrow did not object to nor move to strike Mr. Blume's testimony; it was obvious that Mr. Farrow believed he was "scoring points" with the jury. The following day—after having had an opportunity to confer with his associates and read the "daily copy" of the trial transcript —Mr. Farrow finally offered a motion to strike Mr. Blume's testimony in its entirety. This motion was denied as being untimely. Under Fed.R.Evid. 103(a)(1), a party ordinarily may not challenge a ruling admitting evidence unless he has made a timely motion to strike on the record. It bears emphasis that Mr. Farrow is not a novice attorney who was simply overwhelmed by a hostile witness; instead, it was quite evident that Mr. Farrow refrained from objecting to Mr. Blume's testimony because he perceived that he was creating a favorable impression in the minds of the jurors. In addition, the Court notes that the vast majority of Mr. Blume's testimony was not inadmissible in the first instance; thus, TCI's motion to strike *all* of the witness' testimony was overbroad. Under these circumstances, the Court is unwilling to set aside the contemporaneous objection rule. Accordingly, the Court stands by its decision to overrule defendants' motion to strike Mr. Blume's testimony.

### C. Directed Verdict on Defendants' Counterclaim

Defendants' next argument in support of their request for a new trial is that the Court erred in granting plaintiff's motion for a directed verdict on defendants' counterclaims. TCI's position on this issue clearly lacks merit. At trial, defendants attempted to make a submissible case against plaintiff on the following theories: (1) conspiracy to unreasonably restrain trade; (2) attempt to monopolize; (3) conspiracy to violate TCI's constitutional rights; and (4) tortious interference with TCI's business relations. In attempting to prove their allegation of a secret conspiracy between plaintiff and a host of state and local politicians, TCI repeatedly posed questions to the politician-witnesses to the effect of: "Isn't it true that you had a secret arrangement with plaintiff to drive TCI out of Jefferson City?" Without exception, TCI's pointed accusations were calmly denied. In short, there was absolutely no evidence of any kind of unholy arrangement between plaintiff and governmental officials. To the contrary, the evidence consistently showed that plaintiff at all times remained within legitimate lobbying channels in seeking a cable television franchise. After all of the evidence was in, it became apparent that the gravamen of TCI's counterclaims was that the RFP process initiated by the city was illegal and that plaintiff had somehow violated TCI's rights by participating in the RFP process. Assuming *arguendo* [47] that the RFP process was in fact illegal and that plaintiff did in fact violate defendants' rights by participating in the RFP process, plaintiff still could not be held liable for its conduct because of the *Noerr-Pennington* defense. As noted above,[48] the *Noerr-Pennington* doctrine affords a cloak of immunity from civil damages liability to legitimate efforts to lobby or influence public officials with respect to political action, even if those efforts are designed to eliminate competition. Here, all of plaintiff's allegedly wrongful conduct clearly falls within the purview of the *Noerr-Pennington* de-

**47.** *Cf.* pages 898–901 *supra.*

**48.** *See* page 897 *supra.*

fense;[49] accordingly, it was proper to grant plaintiff's motion for a directed verdict on all of TCI's counterclaims.[50]

D. **Closing Argument**

Defendants' fourth assignment of error in their motion for a new trial is that the Court did not allow their attorneys sufficient time to make a proper closing argument. At the close of all the evidence the Court conferred with the attorneys concerning the amount of time they desired to make their final appeal to the jury. Although the Court was inclined to allow only an hour per side, it acceded to plaintiff's request for ninety minutes per side. Counsel for TCI objected that this amount of time was grossly inadequate in view of the length and complexity of the trial. TCI's request for additional time was overruled. The Court stands by this ruling. There is no doubt but that ninety minutes was adequate time for each side to present its case to the jury. Although this trial was lengthy, it was not particularly complex. The fundamental issues for the jury were whether TCI kept plaintiff out of the Jefferson City cable television market and, if so, whether TCI accomplished that result by using illegitimate means. Unlike many antitrust cases, the instant lawsuit did not turn on technical documentary evidence and expert evidence; instead, the crucial evidence concerned overt conduct. Thus, it was not necessary to allow counsel a great amount of time to make the case understandable for the jury.

Moreover, the Court notes that counsel for TCI was not particularly pressed for time during closing argument. Indeed, there was sufficient time for TCI's attorneys to tell the jury on numerous occasions how little time had been allowed for closing arguments and to extol the virtues of the Sixth [sic] Amendment right to a jury trial in civil cases. There also was sufficient time for TCI's attorneys to describe at great length how their client had been "hometowned" by plaintiff notwithstanding the fact that there was virtually no evidence to support this contention.[51] Under these circumstances, the Court concludes that the amount of time allocated for closing arguments was more than adequate.

E. **Jury Instructions**

Defendants' fifth argument in favor of a new trial is that several of the jury instructions submitted by the Court were in error. Only four of TCI's challenges to the jury instructions will be addressed herein; the remainder must be rejected as lacking merit.

First, TCI insists that the Court's *Noerr-Pennington* instruction[52] failed to set out the precise scope of that defense. The Court disagrees. The instruction was based directly on *Westborough Mall v. City of Cape Girardeau,* where the Eighth Circuit explained that "actions beyond 'traditional political activity' may not be protected by the *Noerr* exemption," particularly if the defendants' lobbying efforts were "accompanied by illegal or fraudulent actions."[53]

TCI next challenges the verdict director for plaintiff's state law tortious in-

49. *See Hopkinsville Cable TV, Inc. v. Pennyroyal Cablevision, Inc.,* 562 F.Supp. at 546–47; *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228 (7th Cir.1975); *see also First Am. Title Co. of S. Dakota v. South Dakota Land Title Ass'n,* 714 F.2d at 1445–47; *City of Kirkwood v. Union Electric Co.,* 671 F.2d at 1180–81; *Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d at 293–297.

50. As noted above, *see* note 7 *supra,* the *Noerr-Pennington* defense is applicable to many types of claims even though it is most commonly associated with antitrust claims. In particular, the *Noerr-Pennington* defense is available with respect to the types of claims asserted by TCI. *See Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 614–15 (8th Cir.1980) (*Noerr-Pennington* doctrine applicable to § 1983 claims); *First National Bank of Omaha v. Marquette National Bank,* 482 F.Supp. at 521, 524–25 (*Noerr-Pennington* doctrine applicable to § 1983 and tortious interference claims).

51. *See* pages 906–907 *supra.*

52. Instruction No. 14.

53. 693 F.2d at 746.

terference claim,[54] asserting that the Court's instruction did not adequately define the elements of the tort. This argument is wholly without merit. The instruction given by the Court was based directly on a pattern instruction [55] which has been approved by the Missouri Supreme Court Committee on Jury Instructions. The use of this instruction has been mandatory in the state court system for years. It is beyond the Court's comprehension how the use of a pattern jury instruction, which *must* be used in state court, can constitute reversible error with respect to plaintiff's state law claim.

Similarly, defendants' challenge to the Court's burden of proof instruction [56] must be rejected. Here again, the Court used the pattern burden of proof instruction which has been approved for use in the state court system.[57] This burden of proof instruction is clear and concise. Its use did not constitute error.

Finally, defendants contend that the Court's instruction on natural monopoly theory [58] was erroneous as a matter of law. Specifically, defendants insist that "[t]he concept that the Sherman Act protects competition for the right to enjoy a natural monopoly is wholly without support in the law." [59] The Court must disagree. Contrary to TCI's characterization, the notion that the antitrust laws protect competition "for" the market in a natural monopoly situation enjoys ample support in the law.[60] Moreover, the Court's instruction correctly stated the law in this area. Accordingly, defendants' objections to the Court's jury instructions will be overruled.

### F. Judicial Bias

Defendants' sixth ground for a new trial is an allegation that they "were denied a fair trial in this case due to the partiality and bias of the Court in favor of plaintiff and against defendants." [61] TCI specifically contends that the Court's "consistently pro-plaintiff rulings" conveyed the Court's bias to the jury and thus tainted the jury's verdict.[62] The short answer to defendants' accusations is that the Court simply was not biased in favor of plaintiff and against defendants. Instead, the Court made every effort to give this cause a fair and impartial hearing and to manifest its sense of impartiality from the bench. Moreover, to the extent that any

54. Instruction No. 23.

55. Mo. Approved Instr. 23.11 [1981 Revision]. The Court's only modification of the pattern instruction was the inclusion of an additional element—"Second, defendants knew of the business expectancy of plaintiff"—upon the request of TCI.

56. Instruction No. 4.

57. Mo. Approved Instr. 3.01 [1981 Revision].

58. Instruction No. 20. In the challenged portion of this instruction, the jury was told:

"... In a natural monopoly situation, competition in the market is not economically feasible; consequently, in a natural monopoly situation, the purpose of antitrust laws is to protect competition for the right to serve the market.... Keep in mind that the purpose of the antitrust laws ordinarily is to protect competition in the market; however, if a market has room for only one firm, the antitrust laws are designed to protect competition for the right to enjoy that natural monopoly position."

59. Suggestions in Support of Defendants' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial, at page 50.

60. *See Omega Satellite Products v. City of Indianapolis,* 694 F.2d at 127 ("the antitrust laws protect competition not only in, but for, the market—that is, competition to be the firm to enjoy a natural monopoly ... and by a modest extension competition to replace the existing natural monopolist") (citation omitted); *see, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 369–70, 93 S.Ct. 1022, 1025–26, 35 L.Ed.2d 359 (1973); *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 659–661, 84 S.Ct. 1044, 1048–1049, 12 L.Ed.2d 12 (1964); *Continental Cablevision v. American Elec. Power Co.,* 715 F.2d 1115, 1120–21 (6th Cir.1983); *Westborough Mall v. City of Cape Girardeau,* 693 F.2d at 745 n. 7.

61. Suggestions in Support of Defendants' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial, at page 28.

62. *Id.* at 29–32.

comments made by the Court suggested its view of the evidence, the jurors were expressly instructed to "disregard all comments of the Court in arriving at [their] own findings as to the facts." [63]

The longer answer to defendants' charge of bias is this: the rulings which were allegedly the result of the Court's partiality were in fact the result of the incompetence of defendants' trial attorneys. For example, TCI claims that the following rulings were motivated by judicial bias: (1) the exclusion of Mr. Lee's expert testimony; (2) the limitation on Mr. Weinstein's expert testimony; and (3) the refusal to strike the testimony of Clarence Blume. As explained above,[64] however, each of these rulings was in fact necessitated by defense counsel's insistence on ignoring simple rules of evidence and procedure. In the case of Mr. Lee, the exclusion of his testimony was required because of counsel's failure to designate him as an expert witness in response to plaintiff's interrogatories. With respect to Mr. Weinstein's testimony, the Court's ruling was based on counsel's failure to supplement interrogatory answers and failure to abide by Fed.R.Evid. 615. Finally, concerning Clarence Blume, the Court's denial of defendants' motion to strike was based on counsel's failure to heed the contemporaneous objection rule. In sum, the Court simply was not biased in ruling on any of the issues in this case; TCI's assertion to the contrary is unfounded.

Similarly, the Court's comments during trial, which were allegedly motivated by bias, were in fact attributable to the discourteous and belligerent manner in which defendants' trial attorneys conducted themselves. On numerous occasions, defense counsel responded to unfavorable evidentiary rulings by muttering to themselves, rolling their eyes, and hurling pens and legal pads at the counsel table with great force. All of these childish antics were performed openly in the presence of the jury, as if defense counsel was attempting to communicate to the jury that their client was being "railroaded" by virtue of the Court's adverse evidentiary rulings. In order to maintain control over the conduct of this trial, the Court admittedly was required to reprimand defense counsel from time to time. Nevertheless, the Court is certain that none of its comments, whether or not made in the presence of the jury, was unwarranted.[65] Consequently, the Court is compelled to hold that defendants' allegations of judicial bias are without basis in fact.

### G. Juror Misconduct

The seventh and final point in defendants' motion for a new trial which will be addressed herein is an allegation that there was improper contact between one of plaintiff's attorneys, Mr. Long, and a member of the jury, Ms. Shern, and that this contact may have tainted the jury's verdict. There are two short answers to TCI's argument. First, there is no indication that the alleged contact between attorney Long and juror Shern related to the merits of this case. Thus, in sharp contrast to the case upon which TCI relies,[66] there is no basis

63. Instruction No. 3.

64. *See* pages 904–906 supra.

65. For example, after excusing the jury and overruling defendants' motion to strike the testimony of Clarence Blume, the Court felt compelled to reprimand attorney Farrow for representing TCI in this lawsuit in the first instance. The dialogue between Mr. Blume and Mr. Farrow made it quite clear that Mr. Farrow was so intimately involved in the events leading up to this litigation that he should have appeared as a witness, not as an attorney. Disciplinary Rule 5–101(B) of the ABA Code of Professional Responsibility expressly provides that a lawyer should refuse employment in a contemplated or pending lawsuit if he knows that he ought to be called as a witness. Undoubtedly, defense counsel believed that the reprimand of Mr. Farrow was merely a manifestation of the Court's hostility. In reality, however, the Court issued the reprimand to Mr. Farrow and a warning that his conduct might result in a malpractice action because this Court fully expects all attorneys practicing before it to live up to acceptable standards of professional ethics.

66. *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892).

for concluding that any improper communications related to merits of the case.[67] Second, the Court notes that Ms. Shern was an alternate juror who did not participate in the jury's deliberations. On each day of the trial, the jurors were instructed not to discuss the case with each other. Thus, even assuming that juror Shern was tainted by virtue of her alleged contact with attorney Long, there is nothing which suggests that this taint spread to the other jurors who actually deliberated over this case. In conclusion, TCI's bare allegation of prejudicial juror misconduct has no support in the record. Accordingly, defendants' motion for a new trial must be overruled.

## IV. Motion for Clarification of the Judgment

The next item on the Court's post-trial agenda is modification of the judgment in this case to reflect the fact that the damage awards under each of plaintiff's claims are alternative, not cumulative. Both plaintiff and defendants are in agreement that plaintiff may recover *either* treble damages of $32.4 million plus a reasonable attorney's fee under plaintiff's antitrust conspiracy claim *or* treble damages of $32.4 million plus a reasonable attorney's fee under plaintiff's actual monopolization claim *or* actual and punitive damages totalling $35.8 million under plaintiff's tortious interference claim. The parties further agree that plaintiff may not recover punitive damages under the state law claim in addition to treble damages under the antitrust laws. The Court concurs. Treble damages are designed "to punish past violations of the antitrust laws ... [and] to deter future antitrust violations." [68] Punitive damages have a similar purpose.[69] Accordingly, it would be inappropriate to allow plaintiff to recover both treble damages and punitive damages.[70] The judgment in this case will be modified to account for this fact.

## V. Motion for Enhancement of Plaintiff's Attorney's Fees

The penultimate question before the Court concerns plaintiff's motion for enhancement of its attorney's fees. As noted above, plaintiff is entitled to an award of a reasonable attorney's fee by virtue of its success on its antitrust claims.[71] As a result of negotiation, plaintiff and defendants have entered into a stipulation as to the amount of attorney's fees and expenses incurred herein. The only issue remaining for the Court is whether plaintiff is entitled to any enhancement of the attorney's fee award. Plaintiff seeks a three-fold increase in the amount of its attorney's fees.

In support of enhancement, plaintiff offers a three-part argument. First, plaintiff contends that enhancement is appropriate because of the risk involved in pursuing this case. Second, plaintiff maintains that enhancement is warranted in view of the uniformly favorable results obtained. Third, plaintiff asserts that enhancement is justified because of the high quality of representation rendered by plaintiff's attorneys.

The Court is inclined to agree that the risks involved in initiating this litigation were substantial and that the professional services rendered by plaintiff's

67. TCI also purports to rely on *California Fruit Exchange v. Henry,* 89 F.Supp. 580 (W.D.Pa. 1950). In *Henry,* however, the district court ultimately refused to grant a new trial after noting that "[a] new trial should not be granted because of irregularities in the conduct of a juror or counsel unless it is made to appear that the alleged misconduct was prejudicial to one of the party litigants." *Id.* at 589. This Court concurs in the reasoning and result set forth in the *Henry* opinion.

68. *American Soc. of Mech. Eng'rs v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 1947, 72 L.Ed.2d 330 (1982).

69. *See* Mo. Approved Instr. 10.01 [1983 Revision].

70. *See McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1381 (8th Cir.1983); *Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1283–84 (8th Cir. 1981); *Arnott v. American Oil Co.,* 609 F.2d 873, 888 (8th Cir.1979).

71. *See* 15 U.S.C. § 15.

attorneys were, for the most part, of a high quality. Nevertheless, the Court will decline to enhance plaintiff's attorney's fees. It bears emphasis that the moving party must meet a "heavy burden" to establish its entitlement to fee enhancement.[72] It also should be noted that fee enhancement is warranted only in an exceptional case.[73]

Turning to the instant case, the Court notes that plaintiff and its attorneys have already been rewarded handsomely for undertaking this litigation. Although plaintiff and its attorneys admittedly undertook a substantial risk by bringing this lawsuit, they knew that a favorable verdict almost certainly would be accompanied by a damage award of approximately $10 million. Thus, whoever took the risk of financing this lawsuit apparently had calculated that the potential payoff justified the initial investment.[74]

Finally, the Court notes that the quality of representation factor has already been accounted for in calculating the base attorney's fee. The keystone of good lawyering is preparation. Here, the generally high quality of representation afforded by plaintiff's counsel is directly attributable to thorough preparation which, in turn, is directly reflected in the number of hours that went into the calculation of the base fee. Consequently, in the absence of any truly exceptional circumstances, the Court will overrule plaintiff's motion for enhancement of its attorney's fees.

## VI. Motion for a Stay of Execution

The final matter before the Court is defendants' motion to stay execution on the judgment herein pending appeal. In support of its motion, defendants contend that their fiscal integrity[75] is sufficient assurance that plaintiff can eventually collect on the judgment. Defendants further submit that it would be a tremendous hardship if they were forced to post a supersedeas bond to cover the amount of the judgment in this case.[76] Be that as it may, the Court does not agree that the sheer size of defendants is sufficient security for the judgment herein. Under ordinary circumstances, a supersedeas bond is required to protect a prevailing plaintiff.[77] Indeed, the purpose of a supersedeas bond is to preserve the status quo while protecting the prevailing plaintiff. In the instant case, however, defendants seek to preserve the status quo without providing any security to plaintiff other than TCI's word. Although the Court does not doubt TCI's integrity, it does not believe that plaintiff should be required to bear any risk pending appeal. The jury heard the evidence in this case and rendered large, though not excessive, damage awards. If one party should endure any inconvenience in order to maintain the status quo, it should be TCI. Consequently, defendants' motion for a stay of execution pending appeal will be overruled.

## VII. Conclusion

In accordance with the foregoing, it is hereby

72. *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1276 (8th Cir. 1980); *see also Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1314 (8th Cir.1981).

73. *See Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984).

74. It is irrelevant whether plaintiff or plaintiff's attorneys assumed the risk of financing this case. If the attorneys were working on a straight hourly fee, plaintiff knew that it would receive the entire judgment in the event of a favorable verdict. On the other hand, if the attorneys took this case on a contingent fee, they assumed the risk of investing their time in this case for a chance at sharing in a multimillion dollar judgment. In short, there was no lack of incentive for the people who financed this case. *Cf. Blum v. Stenson*, 104 S.Ct. at 1548 (a reasonable fee must be sufficient to attract competent counsel but should not be a windfall).

75. According to the affidavit of D.F. Fisher, Treasurer of TCI, shareholder equity in the corporation totalled $223,178,000.00 as of September 30, 1984.

76. Affiant Fisher stated:

"Supersedeas bonds are rarely written in amounts as large as comtemplated [sic] in this case. Numerous underwriters have been contacted without success."

77. *See* Fed.R.Civ.P. 62(d).

ORDERED that defendants' motion for judgment notwithstanding the verdict and alternative motion for a new trial are overruled. It is further

ORDERED that defendants' motion for clarification of the judgment is sustained and the judgment herein is modified to provide that plaintiff may recover treble damages under either of its antitrust claims or actual and punitive damages under its tortious interference claim, but may not recover damages under more than one claim. It is further

ORDERED that, pursuant to the stipulation entered into by the parties, plaintiff's motion for attorney's fees and expenses on plaintiff's antitrust claims, in the amount of $1,311,104.00, is sustained. It is further

ORDERED that plaintiff's motion for enhancement of its attorney's fees is overruled. It is further

ORDERED that defendants' motion for a stay of execution is overruled.