CENTRAL TELECOMMUNICATIONS,
INC., Appellee,

v.

TCI CABLEVISION, INC., Community
Telecommunications, Inc. and
Telecommunications, Inc., Appellants.

No. 85–1805.

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1986.

Decided Aug. 26, 1986.

Rehearing and Rehearing En Banc
Denied Oct. 16, 1986.

Stuart W. Gold, New York City, for appellants.

R. Lawrence Ward, Kansas City, Mo., for appellee.

Before HEANEY and FAGG, Circuit Judges, and WOODS,* District Judge.

HEANEY, Circuit Judge.

This antitrust-monopolization case arises out of competition between TCI, Cablevision, Inc. (and two related corporations, collectively TCI) and Central Telecommunications, Inc. (Central), for a defacto [1] exclusive cable television franchise in Jefferson City, Missouri (the City).

## I. FACTS.

TCI managed the City's cable television system for the Athena Cablevision Corporation from 1973 to 1978. In 1978, it acquired the assets of Athena in the City and was then awarded a three-year exclusive cable television franchise. Three months before TCI's franchise was scheduled to expire, the City initiated a "Request for Proposals" (RFP), or bidding process, to solicit bids to determine the recipient of the next franchise.

Two companies—Central and Teltran—submitted bids for the franchise.[2] TCI refused to participate, arguing that it had a first amendment right to continue to provide cable television services in the City, and that the City thus had no right to award an exclusive franchise to another company. The City contended that its cable television market was a "natural monopoly" and that it could not create competition for its cable TV market without offering an exclusive franchise.

TCI then began a campaign, accompanied by numerous unethical and illegal acts, to

---

* The Honorable HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. Although the franchises at issue in this case were nominally termed "nonexclusive," they were, in practical operation, exclusive. Accordingly, we generally term the de facto exclusive franchises simply "exclusive."

2. TCI ultimately also submitted an application, but the City determined that the application could not be considered because it failed to comply with the RFP.

coerce the City to grant it the exclusive franchise. Nonetheless, after a preliminary vote in January of 1982 in favor of Central, the City Council voted in April, 1982, to grant the exclusive franchise to Central. Central was obligated under this franchise to provide substantially expanded services to subscribers at a cost less than they had been paying. The mayor immediately vetoed this ordinance and the City Council was unable to override it. An ordinance was promptly submitted which proposed renewal of TCI's franchise. The Council deadlocked at a five-to-five vote and the mayor then cast the tie-breaking vote in favor of TCI. The TCI proposal provided fewer viewing channels and inferior picture quality at a higher monthly rate than did the Central proposal.

Central then brought this action against TCI, alleging that TCI had unlawfully interfered with the RFP process to deny Central the franchise and to retain an exclusive franchise for itself. After thirty-one days of trial, the court granted Central's motion for a directed verdict on TCI's counterclaims, and submitted the case to the jury on three theories: 1) that TCI had unlawfully conspired with the mayor and other City officials to retain its exclusive franchise in violation of Section One of the Sherman Antitrust Act; 2) that TCI had undertaken illegal anti-competitive actions to retain its monopoly of the Jefferson City cable TV market in violation of Section Two of the Sherman Antitrust Act; and 3) that TCI had tortiously interfered with Central's business expectancy in violation of the laws of the State of Missouri. The jury ruled in favor of Central on all three claims and awarded $10,800,000 in actual damages on its antitrust and state law claims and $25,000,000 in punitive damages on the state law claim. The court trebled the $10,800,000 award, and entered judgment for $32,400,000 on the antitrust claims and, in the alternative, $35,800,000 on the state law claim. TCI appeals, raising seven issues, each of which we deal with in turn.

## II. DISCUSSION.

### A. First Amendment Challenge to Exclusive Franchising Scheme.

▮ TCI's first contention is that it has a first amendment right to remain in the City's cable television market with or without a franchise from the City, and that, therefore, Central could not have been damaged when it lost the exclusive franchise. We reject this argument. Before reaching the merits of this argument, we note that there is a significant factual problem with it. The district court found:

> Defendants enjoyed every opportunity to produce evidence and make arguments to persuade the jury that they were at all times in favor of head-to-head competition in the market place. * * * [However] the jury [was not] swayed by any of these arguments [and] factual findings implicit in [its] verdict confirm that TCI's endorsement of head-to-head competition lacked sincerity. * * * There was substantial evidence that defendants were engaged in a calculated scheme to prevent plaintiff from entering the Jefferson City market and to maintain a *de facto* exclusive franchise for themselves. * * * The jury's conclusion that defendants * * * were responsible for plaintiff's exclusion from the Jefferson City market * * * completely undermines any attempt to pass the blame on to the city by way of an amorphous "First Amendment defense."

*Central Telecommunications, Inc. v. TCI Cablevision, Inc.,* 610 F.Supp. 891, 903 (W.D.Mo.1985).

Because we find substantial evidence in the over 7,000-page record in support of this conclusion by trial judge and jury, we think that TCI's first amendment defense fails on its facts because it did not seek to simply remain in the market but to continue its monopoly.[3]

---

3. Under the Supreme Court's decision in *Associated Press v. United States,* 326 U.S. 1, 19–20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945), a member of the communications industry who conspires or engages in predatory conduct for the

Assuming arguendo that TCI was willing to compete head-to-head with any competitor, we find TCI's first amendment defense to be without legal merit. The district court held:

> [T]he grant of a single cable franchise is permissible only if the physical and economic conditions of the relevant market give rise to a "natural monopoly" situation. The theory is that, where physical and economic factors render a market incapable of accommodating more than one cable television system, the local governing body is in the best position to determine which proposed system offers the best service to the public for the lowest cost. Since only one competitor can survive in the market, it makes sense to allow the local government to choose the best [4] applicant.

*Central Telecommunications*, 610 F.Supp. at 899–900 (footnotes omitted), *citing Tele-Communications of Key West, Inc. v. United States*, 757 F.2d 1330, 1338 (D.C. Cir.1985); *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 127 (7th Cir.1982); and *Community Communications, Inc. v. City of Boulder*, 660 F.2d 1370, 1378–80 (10th Cir.1981), *cert. dismissed*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982).

The Supreme Court has not directly addressed this issue. In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), it rejected an argument that the natural monopoly characteristics of the newspaper market gave rise to a duty to provide public access to the press. However, it has approved "far more intrusive regulation of broadcasters than of other media [such as newspapers] * * * because of the inescapable physical limitations on the number of voices that can simultaneously be carried over the electromagnetic spectrum." *Quincy Cable T.V., Inc. v. F.C.C.*, 768 F.2d 1434, 1448 (D.C.Cir.1985), *citing, e.g., FCC v. League of Women Voters of Cal-*

*ifornia*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). Thus, the question is whether cable television should be analyzed under the standards applicable to newspapers or those applicable to broadcasters.

TCI contends that cable television is entitled to "coextensive protection" with the press media. In its recent decision in *Los Angeles v. Preferred Communications, Inc.*, —— U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), the Court suggested that the cable medium may be distinguishable from the newspaper medium and that more government regulation of the cable medium may be permissible because cable requires use of public ways and installation of cable systems may disrupt public order. There, a cable television company sued the City of Los Angeles and its cable franchising department, alleging that the City violated its first amendment rights by refusing to grant it a cable television franchise or to allow it access to cable facilities on the ground that it had failed to participate in an auction for a de facto exclusive franchise in the area. The district court dismissed the complaint for failure to state a claim. The United States Court of Appeals for the Ninth Circuit then reversed and remanded for further findings on whether the City's exclusive franchising scheme violated the first amendment where there was economic and physical capacity for more than one franchise. It stressed that the City's only defense was that allowing more than one cable operator would overly burden and disrupt public property and order. The Supreme Court affirmed, "on a narrower ground than the one taken by [the Ninth Circuit]," 106 S.Ct. at 2036, and refused, without development of a more detailed factual record, to set forth the legal standard for assessing first amendment challenges to cable-franchising schemes. The Court simply held that, given that the Los Angeles cable market was not a natural monopoly and that the only alleged justification for limiting the num-

---

purpose of eliminating its competitors is fully liable under the antitrust laws.

4. We note that there is no question here of content regulation in determining who would be the "best" applicant.

ber of cable operators in the Los Angeles area entailed the use and disruption of public property and order, a remand was necessary for determination of whether the petitioner's first amendment rights outweighed the disruptions alleged by the City. Justice Blackmun, with whom Justices Marshall and O'Conner joined, concurring, emphasized:

I join the Court's opinion on the understanding that it leaves open the question of the proper standard for judging First Amendment challenges to a municipality's restriction of access to cable facilities. Different communications media are treated differently for First Amendment purposes. Compare, *e.g.*, *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), with *FCC v. League of Women Voters*, 468 U.S. 364, 381, 104 S.Ct. 3106, 3118, 82 L.Ed.2d 278 (1984). In assessing First Amendment claims concerning cable access, the Court must determine whether the characteristics of cable television make it sufficiently analogous to another medium to warrant application of an already existing standard or whether those characteristics require a new analysis. As this case arises out of a motion to dismiss, we lack factual information about the nature of cable television. Recognizing these considerations, *ante*, at 2037, the Court does not attempt to choose or justify any particular standard. It simply concludes that, in challenging Los Angeles' policy of exclusivity in cable franchising, respondent alleges a cognizable First Amendment claim.

106 S.Ct. at 2038–39.

The Tenth and Seventh Circuits have held that, on the facts before them, cable television is more analogous to broadcasting than to newspapers, and that a "natural monopoly" situation may justify an exclusive franchising scheme. In *Community Communications v. City of Boulder*, 660 F.2d 1370 (10th Cir.1981), Community Communications Corporation (CCC) had been operating an exclusive cable television system in certain neighborhoods of Boul-

der, Colorado, for many years. After several other companies expressed interest in operating cable TV franchises in other areas of the City, the City imposed a moratorium on CCC's expansion in order to provide other companies the opportunity to make bids to service the remaining parts of Boulder before CCC became so entrenched that new entry would be impracticable. CCC alleged that the moratorium violated the first amendment. The City contended that cable television is a natural monopoly and that if it was unable to grant de facto exclusive franchises for various neighborhoods, CCC would remain the only cable television operation in Boulder and its citizens would be denied access to diversity and state-of-the-art programing. The Court of Appeals reversed the district court's order enjoining the City from enforcing the ordinance, and ordered that all parties be frozen in their current circumstances until trial on the merits. The Court applied a balancing analysis, weighing the first amendment concerns against the asserted justifications for the exclusive franchise scheme and held that "natural monopoly is a constitutionally permissible justification for some degree of regulation of cable operators." 660 F.2d at 1379. The Court emphasized that the extent of regulation permissible is narrowly limited by, among other possible factors,

differences in (1) the degree of natural monopoly or "scarcity" characterizing the medium, (2) the pace and potential for technological change, or (3) the uses and possible uses of the medium such as two-way cable communications or even interconnection, [which] might make kinds of regulations constitutionally permissible in one medium that would be forbidden in another. But we caution: the power to regulate is not one whit broader than the need that evokes it. [Footnote omitted.]

*Id.*

The next year, the United States Court of Appeals for the Seventh Circuit also found that where a relevant cable television market is a natural monopoly, an

exclusive franchise may be permissible consistent with the first amendment. In *Omega Satellite Products v. City of Indianapolis*, 694 F.2d 119 (7th Cir.1982), the City of Indianapolis awarded two de facto exclusive cable television franchises for certain sections of the City. A third cable operator also serviced certain apartment complexes in the City. Because it operated simply by installing satellite dishes at the complexes, and thus did not use any public way, it was not subject to the City's franchising ordinance. This company then sought a franchise so it could interconnect apartment complexes without the need to install new satellite dishes at each complex. After the City failed to act on its application, the company connected two complexes with a cable through a drainage culvert. The City ordered the company to remove the cable and the company refused and sought an injunction, on Sherman Act and First Amendment grounds, forbidding the City from removing the cable or enforcing its franchising scheme. The district court denied the request for an injunction and the Court of Appeals affirmed, holding that on the First Amendment challenge, "If Chapter 8½ is invalid under the First Amendment (a question we emphatically do not decide) it is so because it lacks adequate standards and procedures, not because a city may not limit the entry of cable television companies." *Id.* at 129. It distinguished cable television from newspapers on the ground cable requires use of public ways and because television enjoys "universal access to the home * * * and [there is] a resulting felt need to protect children." *Id.* at 127–28. Accordingly, it stated that although natural monopoly is not a justification for exclusive franchising for newspapers, "The apparent natural monopoly characteristics of cable television provide * * * an argument for regulation of entry." *Id.* at 127–

28. *See also Tele-Communications of Key West v. United States*, 757 F.2d 1330 (D.C.Cir.1985) (Holding that if cable company could show that there were no practical reasons why two cable operators could not serve Air Force base, Air Force's exclusive franchising scheme would violate the first amendment.) *But cf. Preferred Communications v. City of Los Angeles*, 754 F.2d 1396, 1404–05 (9th Cir.1985), *aff'd and remanded on other grounds*, —— U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (Although the Court did not reach the argument that natural monopoly justifies government regulation of cable television because it assumed that competition for cable services is economically feasible in the Los Angeles area, it implied that "natural monopoly" is not a justification for exclusive franchising.)

We recognize that there are profound first amendment implications inherent in the regulation of cable operators. Changes in technology such as were presented in the *Omega* case may require a different approach to exclusive franchising schemes. We are also aware of the difficulties inherent in the regulation of cable television programming. *See, e.g., Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434 (invalidating *FCC*'s "must carry" cable television regulations on first amendment grounds). *Cf. FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 691 (1979) (invalidating as beyond F.C.C.'s jurisdiction rules requiring cable operators to make channels available for local access). Thus, we make clear, as did the Supreme Court in *Preferred Communications*, that we are unwilling to decide any question which is not squarely before us and on which there has not been a full development of the record. We are not faced here with a challenge to the details of Jefferson City's franchise regulations,[5] and we, of course,

---

5. Inherent in the City's authority to choose the "best" cable operator for the City is the issue of how the City may reach this conclusion. In this connection, we note that the RFP terms are directed toward providing the widest array of programing at the lowest cost and do not seek to prohibit the communication of any message.

Thus, the RFP deals primarily with rates, quality and geographic breadth of service and states:

> The City is establishing few requirements as it desires that all applicants have maximum freedom to develop their own innovative proposals. * * * The City is interested in receiving proposals for a system with the capacity

consider the "natural monopoly" question only in terms of the competing technologies offered by TCI and Central. TCI's brief states the First Amendment issue to be: "Did plaintiff, which was seeking an exclusive cable television franchise that would deny others equal access to speak through the cable medium, have a protectable interest under federal antitrust or state tort law when it was not awarded the exclusive franchise?"

■ We hold that Central did have a protectable interest because it proved, to the satisfaction of the jury and the trial judge, that the "natural monopoly" characteristics of the Jefferson City cable market justified the City in offering a de facto exclusive franchise in order to create competition for its cable television market. There is substantial support in the record for these factual findings.[6] TCI gained its monopoly through an earlier grant of a de facto exclusive franchise. Unless the City opened up competition *for* the market, TCI would have remained entrenched in its monopoly position. TCI refused to provide other than an outmoded limited channel system whereas Central proposed a state-of-the-art system with far more channels at a lower cost, and, accordingly, more variety of programming for the public. It is difficult for us to see how, on this record, TCI's position enhances First Amendment values. It is true that TCI has a First Amendment interest in remaining as a cable television "speaker," but Central has a similar interest. Because the evidence shows that given the technology offered by the competing companies, there was economic capacity for only one speaker, it seems clear that Central's proposal went further in advancing the First Amendment interests of the viewing public in the greatest variety of programming obtainable.

In sum, we reject TCI's First Amendment challenge for two reasons. First, the evidence reveals that TCI was not sincere in advocating competition in the market but simply sought to retain a monopoly originally gained through the grant of a de facto exclusive franchise. Second, the evidence reveals that the City's cable television market is currently a natural monopoly which, under present technology, offers room for only one operator at a time. Thus, we hold that the City could properly offer a de facto exclusive franchise in order to create competition for its cable television market.

### B. Noerr-Pennington Defense.

TCI contends that all but two of its allegedly anticompetitive actions, the threats of its corporate vice president to the City's consultant and a similar threat to a competitor, are protected activity within the purview of the *Noerr-Pennington* doctrine. This doctrine, derived from the cases of *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), exempts from antitrust liability[7] activities

---

of delivering at least 50 channels to subscribers and with * * * technical standards which exceed current FCC requirements. * * * The City is not interested in proposed capacity which will not be used or which will necessitate unreasonably high subscriber rates. The City is interested in a flexible system which can best accommodate the present and future needs of institutional users without unduly burdening the average subscriber.

6. *See, e.g.,* plaintiff's exhibit (PX) 400 (Touche Ross study); 19 T. 86 (Testimony of John Clair Smith, summarizing Touche Ross study: "The basic conclusion is that * * * a direct house-to-house competition between two cable compa-

nies would not be financially feasible in Jefferson City, that the market would not support sustained house-to-house competition.")

7. The district court stated that "[a]lthough the *Noerr-Pennington* defense is most often asserted against antitrust claims, it is equally applicable to many types of claims which seek[ ] to assign liability on the basis of the defendant's exercise of its first amendment rights." *Central Telecommunications,* 610 F.Supp. at 896 n. 7. Although the United States Supreme Court has not directly confronted this issue, this Court has indicated that it agrees with the principle stated. *See, e.g., In Re IBP Confidential Business Documents Litigation,* 755 F.2d 1300, 1312 (8th Cir.

which are specifically designed to procure favorable governmental action, even when the underlying motivation and effect of the activities is anti-competitive. *See generally* 7 Von Kalinowski, Antitrust Laws and Trade Regulation, § 46.04 (1982).

In early 1980, the City considered holding out its cable franchise to competitive bidding. Shortly thereafter, TCI met with the mayor and attempted to persuade him to renew its franchise without a competitive bid process, so as to avoid a "frontal attack" by competitors. In December, 1980, the City issued its RFP, inviting any company, including TCI, to bid. Thereafter, the City hired Elmer Smalling as a cable television consultant to evaluate the various bids. TCI, upon learning that the City had hired Smalling, publicly attacked his qualifications in a defamatory manner.

On several occasions, from January of 1981 to the summer of 1981, Paul Alden, TCI's vice president and national director of franchising, telephoned Robert Brooks, chief operating officer of Teltran, a company which submitted a bid for the City's franchise, and threatened him that unless Teltran withdrew from the bidding process, TCI would make trouble for Teltran in Columbia, Missouri, where it operated a cable television franchise. Teltran subsequently dropped out of the bidding process on the ground there was a "distasteful environment" in Jefferson City.

In February, 1981, Alden and Harold Farrow, TCI's attorney, met with City officials and attempted to pressure them to abandon the RFP process and negotiate exclusively with TCI. In March of 1981, Alden called the mayor and threatened to turn the system off unless TCI's franchise was renewed. That same month, TCI filed a lawsuit against the City challenging the RFP process. During the litigation, TCI served on officials of the bank from which Central sought financing a subpoena seeking a very wide range of potentially confidential records. Central alleges that this was designed to destroy its financing.

In June of 1981, Alden approached Smalling and expressed TCI's displeasure with Smalling's participation in the RFP process. Alden threatened Smalling with statements like: "We know where you live, where your office is and who you owe money to. We are having your house watched and we are going to use this information to destroy you. You made a big mistake messing with T.C.I. We are the largest cable company around[.] We are going to see that you are ruined professionally." PX 83. Smalling understood these statements to be a threat to the lives of himself and his family. At this same time, Warner-Amex (another large cable company) was a client of Smalling's. Alden contacted Warner-Amex about Smalling. Following the threats, Smalling lost Warner-Amex as a client. Smalling told City Attorneys Christopher Graham and Thomas Utterback about Alden's threats. PX 83. On July 6, 1981, Utterback wrote the mayor and suggested that the RFP process be abandoned because some of the parties were interfering with the competitive bid process. PX 84. Utterback also expressed these concerns in a memorandum to the City Council in which he described TCI as a "relentless corporate bully." DX 17, T. 128.

In the fall of 1981, TCI met with Utterback and agreed to negotiate privately for renewal of its franchise, although this secret agreement and the subsequent private negotiations violated the RFP, which specified that all negotiations would be open,[8] as well as Missouri's "sunshine law." Mo. Rev.Stat. §§ 610.010–.030. After the City Council voted on January 25, 1982, to provisionally grant the franchise to Central, TCI refused to pay and withheld the prior year's franchise fees which were due and owing to the City in an amount exceeding $60,000. It had no basis for this withhold-

1985). We reiterate our agreement with this position—which is not challenged on appeal—at least with respect to the tortious interference claim at issue.

8. The RFP provides that "to insure that all negotiations will be open, no applicant shall contact any City Councilman or the Mayor outside the Council Chambers." PX 84A at 20(a).

ing other than an attempt to subvert the RFP process.

Throughout this period, TCI continued to publicly announce that it would cut off service if it was not awarded the franchise, and it announced that it would not sell "one bolt" of its system to whoever received the new franchise and that it would "rather have [its system] rot on the pole" than sell it to a competitor at any cost. Further, TCI's system manager in Jefferson City told elderly residents of a senior citizens' home that TCI would cut off service if denied a franchise, and the residents would be without television for two years pending construction of a new system because the concrete walls of their residence would not allow reception of over-the-air stations.

Additionally, TCI accompanied its franchise battle with misstatements of fact. For example, in one City Council meeting, Alden misrepresented to the council that TCI was the largest distributor of satellite dishes in the county, with an "exclusive" in Missouri, both "facts" he later admitted were untrue. TCI implied that only it could protect the City's cable system from destructive competition from satellite dishes. The district court also stated that an implication of this statement was that TCI would flood the City with satellite

dishes unless it received the franchise. 610 F.Supp. at 895.

By April 5, 1982, the City reached an agreement to award the franchise to Central. At that point, the mayor, who had recused himself from the cable television issue for over a year due to an alleged conflict of interest, announced that he was reentering the cable television controversy, and he privately advised council members that he would veto any ordinance awarding a cable television franchise to Central. TCI and certain City officials, including the mayor, then met privately to negotiate a franchise for TCI. As part of the agreement, the mayor agreed to veto any award of a franchise to Central.

On April 20, 1982, the City Council passed the ordinance awarding a franchise to Central. The vote was six in favor and four against. The mayor vetoed the ordinance. The council then deadlocked five-to-five on awarding a franchise to TCI and the mayor cast the deciding vote in favor of that company.[9] The next day, TCI dismissed its lawsuit against the City and paid the withheld franchise fees.

TCI's initial argument is that even though its agent, Alden, may have made coercive threats to Smalling and Teltran, which are not protected under *Noerr-Pennington*, these threats did no harm to Cen-

9. The differences between Central's and TCI's proposals are outlined in PX 285. The Central proposal was superior in numerous respects. A few of the more significant advantages are summarized in the following chart:

**COMPARISON OF CENTRAL TELECOMMUNICATIONS, INC., PROPOSAL**

**WITH REQUIREMENTS OF FRANCHISE ORDINANCES NO. 9777 and NO. 9778**

[Awarding franchise to TCI]

| ITEM | CENTRAL TELECOMMUNICATIONS, INC. PROPOSAL | ORDINANCE No. 9777 & No. 9778 |
|---|---|---|
| ADDRESSABLE CONVERTERS | Provided to All Subscribers | Provided only to Subscribers Taking Expanded Service |
| EQUIPMENT FOR INTERACTIVE SERVICES | Head end Equipment Installed | None |
| SYSTEM DESIGN | Single Residential Cable (42 Channels Downstream Capacity, 4 Channels Upstream Capacity) | Present System Expanded From 12 Channels to 21 Channels Downstream Capacity Within 12 months |
| | Single Institutional Network Cable | No Institutional Cable |
| | 2 Satellite Earth Stations | 1 Satellite Earth Station |
| SERVICES AND PROGRAMMING | Imported TV Stations—13 | Imported TV Stations—11 |
| | Pay TV Services—4 | Pay TV Services—2 |
| | FM Radio Service—23 Stations | FM Radio Service— "in Excess of" 15 Stations |

tral and thus cannot serve as a basis for imposing liability. We disagree. The jury was given a proximate cause instruction and informed that it could only base liability on acts which were not genuine efforts to influence City officials. Giving Central the benefit of all reasonable inferences to be drawn from the record, the jury may have concluded that TCI's heavy-handed tactics frightened the mayor and some members of the City Council into awarding the franchise to TCI.

Additionally, TCI contends that even if Alden's threats harmed Central, the verdict must be set aside because we have no way of knowing whether the jury relied on these threats or on protected conduct in assessing liability against it. We reject this argument for several reasons:

First, the parties agreed to submit the case to the jury on a general verdict instruction and form, and there is evidence on the record as a whole to support the verdict. *Ybarra v. Burlington Northern, Inc.*, 689 F.2d 147, 150 (8th Cir.1982); *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 607 (Fed.Cir. 1984), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1985) ("In the absence of special interrogatories we presume the existence of factual findings and legal conclusions necessary to support the verdict reached by the jury.").

Second, TCI was under no obligation to continue to provide service to the residents of Jefferson City after its franchise expired, and it certainly had the right to inform City officials, its customers and the public at large of its intent not to do so. Likewise, TCI was under no obligation, except as required by the franchise agreement, to sell its cable television system to its successor, and it had a clear right to inform City officials, its customers and the public at large that it would not do so. *Cf. United States v. Otter Tail Power Co.*, 331 F.Supp. 54, 61 (D.Minn.1971), *aff'd*, 410 U.S. 366, 368, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509 (10th Cir.1984), *aff'd on other grounds*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

Had TCI made a simple clear request that the jury be so instructed, it would have been error to refuse the request. But it appears from the record as a whole that TCI was not satisfied with this approach. It rather wanted and requested a broader instruction that would have immunized other conduct which the jury could well have found unlawful.[10] The district court refused to give TCI's overly broad, long and

**COMPARISON OF CENTRAL TELECOMMUNICATIONS, INC., PROPOSAL**

**WITH REQUIREMENTS OF FRANCHISE ORDINANCES NO. 9777 and NO. 9778—Continued**

[Awarding franchise to TCI]

| ITEM | CENTRAL TELECOMMUNICATIONS, INC. PROPOSAL | | ORDINANCE No. 9777 & No. 9778 |
|---|---|---|---|
| INITIAL RATES | Basic TV Service: | | Basic TV Service: |
| | Tier I (21 Channels)—$6.00/Month | | Tier I (12 Channels) $6.55/Month |
| | Tier II (38 Channels)—$8.00/Month | | Tier II (21 Channels) $8.55/Month |
| | Pay TV Service: | | Pay TV Service: |
| | Home Box Office | $7.95/Month | Home Box Office $9.95/Month |
| | Showtime | $8.45/Month | Showtime $9.95/Month |
| | Cinemax | $9.45/Month | — |
| | Movie Channel | $7.95/Month | — |

**10.** TCI proposed the following *Noerr-Pennington* instructions:

NOERR–PENNINGTON—GENERAL

The Constitution ensures the right of all persons and corporations, whether acting individually or in concert, to petition government for political action, recognizing that persons in the exercise of these constitutional rights naturally will petition government for political action that is favorable to their particular interests and unfavorable to the interests of others. The Supreme Court has declared that this right to petition government for political action is paramount, and that the concerted effort of various

confusing *Noerr-Pennington* instructions, preferring more concise and understandable instructions and allowing TCI to argue at length before the jury that all of its activities were genuine lobbying efforts protected under *Noerr* and the threat to turn off service was lawful because TCI could not continue to provide service without a franchise. Under these circumstances, it is difficult to fault the district court judge for instructing the jury as it did and in permitting TCI to argue that it was simply exercising its first amendment rights when it engaged in the course of conduct that it did.

■ Third, the trial court's jury instructions adequately informed the jury of the

parties genuinely to influence public officials does not in any way violate the law regardless of intent or purpose. Joint efforts truly intended to influence public officials to take official action do not violate antitrust laws even though the efforts are intended to eliminate competition.

Similarly, the Constitution protects a person's right of access to the courts for resolution of disputed issues. The antitrust laws are not violated when a person files a suit, even if he hopes and intends that the judge or jury will enter verdicts which will injure his competitors.

In short, activity which is intended to influence or cause official governmental action—whether by an individual such as a mayor, by a legislative body such as a City Council, or by judges and juries—does not violate the law, regardless of the intentions of the persons engaging in such activity.

NOERR–PENNINGTON—APPLICATION
TO THIS CASE

To the extent that you find that defendants engaged in legitimate efforts to influence governmental action or to seek redress for its grievances through the courts, you are directed that you cannot find the defendants liable for any of the claims asserted by plaintiff based upon such activity. For example, if you were to find that all of defendants' actions about which plaintiff complains fit into this category of legitimate attempts to influence official action or to vindicate rights through the courts, then you could not find defendants liable for any of the offenses charged. That is, if you should conclude from a review of the evidence that defendants did nothing more in this case than take actions for the purpose of persuading the City to award them a cable television franchise on some basis, then you may not find that defendants committed any of the offenses charged, even if you believe that the purpose or necessary effect of such actions was to exclude plaintiff from obtaining a franchise. On the other hand, if you were to find that none of defendants' actions fit into that category, then you would simply assess those actions under the standards we have already discussed and without regard to this instruction. Finally, if you find that some of defendants' actions were legitimate attempts to influence governmental action but that some were not, then when you decide whether the evidence establishes that defendants committed any of the charged offenses, you must exclude

from your consideration those actions which you find did in fact fall into that category, for they may not form the basis—in whole or in part—for any liability.

NOERR–PENNINGTON—EXCEPTIONS

However, the activity we are discussing must consist of genuine efforts to influence governmental action or to vindicate rights through the courts. Protection does not extend to purported petitioning that is a mere sham to cover what actually is nothing more than an attempt to interfere directly with the business of a competitor. That is, protection does not extend to activities that are merely a pretext for inflicting on plaintiff an injury not caused by any government action. Thus, you must consider whether defendants' activities were not really an attempt to influence an official to take official action, but instead were an attempt to interfere directly with the business of plaintiff. When deciding this question, you must consider the intent of defendants in taking such actions. If you find that their intent was to obtain some governmental action, no matter what the action was, then these activities were genuine. The success of defendants' efforts is evidence of their genuineness.

In the context of defendants' lawsuit against the City, about which you have heard some evidence, you must decide whether defendants filed the suit with the hope of obtaining a judicial ruling in their favor, or whether the suit was only intended to directly injure plaintiff in some manner. The extent to which a lawsuit involves legitimately disputed issues is circumstantial evidence of the genuineness of the suit. The knowledge that defense of the litigation might impose burdensome costs upon the City would *not* be sufficient to establish that defendants brought the suit in bad faith, in an attempt to injure plaintiff.

Finally, the Constitution does not protect attempts to influence governmental action by methods which are illegal in and of themselves; for example, by bribery of government officials. Such actions are not legitimate attempts to petition the government.

In sum, you must decide whether all or some of defendants' activities were legitimate and genuine efforts to obtain a franchise from the City. All such efforts must be excluded from your consideration of this case because they cannot—as a matter of law—form the basis of liability for any of the offenses charged.

*Noerr-Pennington* doctrine and that it could find that TCI's activities were protected activities within the parameters of this doctrine. Instruction Number 15 informed the jury that it could "not consider TCI's 1981 lawsuit against Jefferson City to have been unlawful conduct even if it was designed to eliminate competition." Instruction Number 14 informed the jury:

> In deciding whether defendants engaged in any unlawful conduct in this case, you are instructed that you may not consider defendant's legitimate lobbying efforts with the Jefferson City officials. The defendants are entitled under the law to use genuine efforts to influence public officials but if in fact defendant's lobbying activities included threats, intimidation, coercion or other unlawful acts, then you may find that such activities were not genuine efforts to influence public officials and you may consider those acts to have been unlawful conduct.

TCI contends that Instruction Number 14 allowed the jury to base its verdict on activities which were lawful under *Noerr-Pennington.* We reject this argument because we find that the instruction's statement that *Noerr-Pennington* protects all "genuine" lobbying efforts but does not protect "threats, intimidation, coercion, or other unlawful acts" which were "not genuine efforts to influence public officials" was proper under the case law, the facts of this case, and in light of the instructions submitted by the parties.

In *Noerr,* the Court stated that when a "campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor * * * the application of the Sherman Act would be justified." *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533.[11]

In *Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 however, the Court cautioned:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. The jury should have been so instructed.

*Id.* at 670, 85 S.Ct. at 1593.

In *California Motor Transport,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 the Court first applied the so-called "sham exception" to the *Noerr-Pennington* doctrine. There, the defendants maintained a trust fund which they used to oppose all license applications by their competitors with or without probable cause and regardless of the merits of the applications. The Court affirmed the Ninth Circuit's reversal of a district court order dismissing plaintiffs' antitrust action on *Noerr-Pennington*

---

11. The *Noerr* Court noted, however, that the defendants' activities—even though they included misrepresentations and unethical conduct—were not covered by the Sherman Act at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws. 365 U.S. at 140–42, 81 S.Ct. at 531–32. The unethical conduct referred to involved the defendants' use of the so-called "third-party technique"—a misrepresentation through which the railroad defendants' attempts to gain passage of laws favorable to railroads and unfavorable to the plaintiff trucking companies were made to appear as originating from independent parties. However, even though the use of this third-party technique involved misrepresentation as to the source of the petitioning, the position advanced by the defendants—essentially that trucks were harmful to the state's highways and interfered with motorists' rights—was a legitimate one, "conducted along lines normally accepted in our political system," *id.* at 145, 81 S.Ct. at 533, even though anti-competitive. The case before us is distinguishable in that the jury could properly have found, based on the facts and the court's instructions, that TCI's activities, more than being simply anti-competitive, were not genuine lobbying activities at all but instead were heavy-handed attempts to directly interfere with the business relationships of a competitor, to disturb the political process and to coerce the City into extending TCI's monopoly position, even though Central offered a superior cable system at lower cost. Much of TCI's "lobbying" made no attempt to provide the City with information on which to base a reasonable choice but, instead, sought to subvert the franchising process.

grounds because it found that the defendant's activities may not have been genuine efforts to influence the government but instead may have been simply a "combination of entrepreneurs to harass and deter their competitors from having 'free and unlimited access' to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities." 404 U.S. at 515, 92 S.Ct. at 614.

In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 539 (1973), the Court described *California Motor Transport* holding

> that the principle of *Noerr* may also apply to the use of administrative or judicial processes where the purpose to suppress competition is evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims and thus is within the "mere sham" exception announced in *Noerr*.

*Id.* at 380, 93 S.Ct. at 1031.

This Court has on numerous occasions explored the meaning of the *Noerr-Pennington* doctrine and its "sham" exception. For example, in *Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 296–98 (8th Cir.1978), we summarized the facts and holdings in *Noerr, Pennington* and *California Motor Transport* and then examined the meaning of the "sham" exception:

> [T]he essential element of the sham exception, whether employed in an adjudicative or nonadjudicative setting [is] an absence of a genuine effort to influence government but, rather, an intent to injure a competitor directly.
>
> * * * *
>
> The fundamental question presented in each case involving the "sham" exception, whether argued in a nonadjudicative or an adjudicative setting, is the question

of intent. * * * As always in deciding questions of intent, the court considers all of the surrounding circumstances and assigns to each circumstance an appropriate weight, dependent upon the function and significance of each. Thus in *California Motor* the Court considered the "manner of exercise of the right of association and petition," the defendants' other activities against competitors, and the adamant stand taken in defendants' opposition to other applications, all to ascertain whether there was a true intent to injure competitors directly rather than to influence governmental action. The distillation of all of the applicable factors in each case governs the decision as to true intent, whether it is to directly injure competitors rather than to influence governmental action. In *California Motor* a consideration of all of the factors lead the Court to conclude that the allegations came within the sham exception in the *Noerr* case, "as adapted to the adjudicatory process" in that the defendants' purpose was to deny a competitor "free and meaningful access to the agencies and courts." [12]

We also quoted with approval from an antitrust commentator that "[c]onstruing the sham exception as enunciated in *Noerr* to include all activity not genuinely designed to influence the government is more consonant with the Court's central ruling." 580 F.2d at 296, *citing D. Fischel, Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine*, 45 U.Chi.L.Rev. 80, 105 (1977).

In *Westborough Mall v. City of Cape Girardeau*, 693 F.2d 733 (8th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983), we again elaborated on the "sham" exception to the

---

12. The plaintiff in *Mark Aero* was an air taxi operator who wanted to reopen the Kansas City Municipal Airport for commercial flights. Two of the plaintiff's competitors opposed the reopening by conducting a publicity campaign and by exerting pressure on public officials. No illegal activities were alleged, as in the case before us, although Mark Aero did allege that the defendants "induced others to make false and misleading statements" and used "economic coercion" on City officials. We hold that the defendants' activities were protected by *Noerr-Pennington* because "none of the defendants' alleged wrongful acts constitute more than joint efforts to influence the City officials' decision in the airport controversy." 580 F.2d at 296.

*Noerr-Pennington* doctrine. There we held:

> [T]he defendants may not be protected by *Noerr* because their legitimate lobbying efforts may have been accompanied by illegal or fraudulent actions. *See Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Local 150,* 440 F.2d 1096, 1099 (9th Cir.), *cert. denied,* 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971); *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1296–1298 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). The *Noerr-Pennington* doctrine was not "intended to protect those who employ illegal means to influence their representatives in government." *Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Local 150, supra,* 440 F.2d at 1099. *See generally* 7 Von Kalinowski, Antitrust Laws and Trade Regulation, *supra,* § 46.04[3] at 46–55. In *Gorman Towers, Inc. v. Bogoslavsky,* [626 F.2d 607 (8th Cir.1980) ] *supra,* we recognized that actions beyond "traditional political activity" may not be protected by the *Noerr* exemption. *Id.,* 626 F.2d at 615. Because the plaintiffs have presented facts that support an inference of unlawful conduct—city officials may have been induced by the May-Drury defendants by means other than legitimate lobbying to illegally revert plaintiffs' C–4 zoning—the *Noerr* doctrine may not be relied upon to support the district court's grant of summary judgment. *See Federal Prescription Service, Inc. v. Pharmaceutical Ass'n,* 663 F.2d 253, 266 (D.C.

Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).[13]

693 F.2d at 746.

In the *Sacramento* decision cited in *Westborough Mall,* the United States Court of Appeals for the Ninth Circuit stated:

> [I]t does not seem to this Court that the doctrines of *Noerr* and *Pennington* were intended to protect those who employ illegal means to influence their representatives in government. These doctrines were enunciated to see that the antitrust laws did not impede the free flow of communication between the people and the government. But there can be little reason to extend the special immunity of *Noerr* and *Pennington* to a type of "communication" which includes threats and other coercive measures. There is no room for such tactics in a democratic system.
>
> In the case before us it was alleged that the defendant unions influenced the State Fair officials by means of threats, intimidation and other coercive measures. The doctrines of *Noerr* and *Pennington* are not, therefore, applicable.

440 F.2d at 1099

*See also In Re IBP Confidential Business Documents Litigation,* 755 F.2d 1300, 1313 (8th Cir.1985) (*Noerr-Pennington* doctrine cannot be extended to "activities which, although 'ostensibly directed toward governmental action,' are actually nothing more than an attempt to harm another" or to "false communications" or to tortious, violent, defamatory or other illegal acts [citations omitted].).

We think that the trial court's jury instruction adequately informed the jury of the *Noerr-Pennington* doctrine and the sham exception.[14] The instruction does not

**13.** TCI alleges that the defendants in *Westborough Mall* attempted to bribe public officials. However, our reading of that case reveals that it did not invoke the sham exception on grounds of bribery but on the ground that the plaintiffs might be able to prove an illegal conspiracy between defendants and the City which included illegal private negotiations such as those at issue in the case before us.

**14.** TCI also alleges that the trial court's conspiracy instruction "essentially negated" the *Noerr-*

*Pennington* defense. We reject this argument. First of all, TCI did not specifically raise this objection below, and thus we could order a new trial on this basis only if the alleged error is "plain error." In any event, we find TCI's oblique argument to be completely without merit. We find nothing in the conspiracy instruction which negates the *Noerr-Pennington* instruction. The jury was informed that "each * * * instruction is equally binding upon you." Conspiracy Instruction Number 11 read along with Instruc-

have the problem that the instruction which was disapproved in *Pennington* had. It does not state that legal petitioning activities can be illegal if accompanied by anti-competitive intent. Instead, it describes the essence of the "sham" exception—were defendant's petitioning activities genuine attempts to influence government action, or were they designed to directly interfere with the business relationships of a competitor?

■ Finally, our review of the record reveals full support for the jury's and trial judge's conclusion that TCI overstepped the boundaries of *Noerr-Pennington* protection. Much of TCI's campaign was not directed at informing public officials or the public of TCI's position. Instead, TCI sought to distort the process by refusing to participate in the RFP process, by threatening the City's consultant and one of its competitors, by withholding the past due franchise fee, by attempting to interfere with Central's financing, and by coercing the City into holding private negotiations in violation of the RFP terms and Missouri's sunshine laws. Indeed, TCI's argument would effectively repeal the sunshine laws and administrative laws prohibiting *ex parte* contacts. TCI's argument that *Noerr-Pennington* allows them to engage in excessive and intimidating conduct proved too much for the trial judge and jury, and it proves too much for us.[15]

### C. State Action Defense.

TCI contends that Central could not have a cause of action under the antitrust laws because the City is immune under the state action doctrine. Central contends that this argument is without merit because there is no clearly and affirmatively expressed policy of the Missouri legislature directing the City to displace competition, and TCI's agreement with the City is not in furtherance of any such policy. Central also argues that, in any event, TCI did not raise its "state action" argument in its answer, motion to dismiss, motion for summary judgment, pretrial filings, or its statement of issues in this Court. It points out that, in fact, TCI took precisely the opposite position below, stating in its j.n.o.v. motion that the City's actions were not "state action." Although we doubt that TCI's "state action" argument has merit, we decline to reach it because "defenses not raised or litigated in the trial court cannot be urged for the first time on appeal." *Gardner v. Meyers*, 491 F.2d 1184, 1190 (8th Cir.1974).

### D. Evidentiary Rulings.

■ TCI raises numerous objections to the trial court's evidentiary rulings and contends that the trial court gave improper and confusing instructions to the jury. Af-

tions Number 21 and Number 14 (*Noerr-Pennington*) fully informed the jury that before any antitrust liability could be imposed, it had to find that TCI "knowingly entered into a combination or conspiracy" and that in determining liability, it could not consider TCI's "legitimate lobbying efforts."

15. Central raises several other reasons why TCI's conduct was not protected under *Noerr-Pennington*. Although some of these arguments may have merit, we need not reach them here. Central argues that the *Noerr-Pennington* doctrine is inapplicable here because this case involves a municipality acting in an essentially commercial rather than in an executive, legislative or adjudicatory capacity. *See, e.g., Sacramento*, 440 F.2d at 1099; *Hecht v. Pro-Football, Inc.*, 444 F.2d 931, 941–42 (D.C.Cir.1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *George R. Whitten, Jr. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 33 (1st Cir.),

*cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970). Central also argues that TCI's conduct cannot be described as merely "political" in nature because the ultimate act it sought from the City, the award of a cable television franchise, is not protected "state action" because there is no clearly and affirmatively expressed policy in Missouri authorizing cities to displace competition in the cable television industry. *See, e.g., Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). Finally, Central argues that the *Noerr-Pennington* doctrine is inapplicable because the jury found that there was an illegal conspiracy between TCI and certain City officials, including Utterback and the mayor. *See, e.g., Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555, 1566–67 (5th Cir.1984), *cert. denied*, — U.S. —, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986); *Duke & Co. v. Foerster*, 521 F.2d 1277, 1281–82 (3d Cir.1975).

ter a thorough review of the record, the jury instructions as a whole, and the trial court's lengthy explanation of its evidentiary rulings and jury instructions, we find that many of TCI's objections were not properly preserved for appeal and, in any event, that the trial court did not abuse its discretion in its evidentiary rulings, that the jury instructions adequately stated the law, and that the court's allowance of ninety minutes per side for closing arguments was not an abuse of discretion.

### E. Monopoly Power in a Regulated Market.

■ TCI contends that, as a matter of law, it could not have possessed monopoly power because Jefferson City regulated price and entry in the cable television business. We reject this argument. Monopoly power is the power to control prices or exclude competitors. *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Here, TCI had the power to raise the price of "premium" channels without the approval of the City. Most significantly, TCI used its entrenched position and the various unethical or illegal practices outlined in our *Noerr-Pennington* discussion to exclude competition.

TCI miscites our decision in *National Reporting Co. v. Alderson Reporting Co.*, 763 F.2d 1020 (8th Cir.1985), as establishing that a company cannot possess monopoly power in a regulated market. There, the United States Tax Court contracted on a yearly basis for court-reporting services. The court allowed contractors who performed satisfactorily to renew their contract at the previous year's rate. If, however, the contractor wanted to raise his price, the court put the contract out for bid. When National Reporting Company, which had the current contract, requested a price increase, the court let the contract out for bid. Alderson Reporting Company submitted a bid more than 300 percent lower than National's bid, and received the contract. National then brought an antitrust action against Alderson, alleging that Ald-

erson submitted a predatory below-cost bid with the intent to drive competitors out of the market and create a monopoly. We reversed a district court judgment in favor of National, and held that Alderson could not possess monopoly power because it did not have the power to control prices or exclude competition. National's theory was that Alderson submitted a predatory bid and then would increase prices the next year. However, we pointed out that as soon as Alderson raised its price, the contract would be put out for bid and that "[c]ompetition is alive and well in the relevant market." *Id.* at 1023.

That factual situation is completely inapposite to our case. Unlike TCI, Alderson had not threatened competitors into not submitting bids, and it took no other action to destroy the competitive bidding process. The mere fact that the Jefferson City cable market is regulated cannot hide the fact that TCI had monopoly power in the market, and it used that power and other methods other than superior ability to exclude competition. As the United States Supreme Court stated in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973), "Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws."

### F. Sufficiency of the Evidence on the Conspiracy Count.

■ TCI contends that we must overturn the jury's verdict on Section One of the Sherman Act because there is insufficient evidence of a conspiracy or combination. Central contends that TCI is merely repeating an argument rejected by the jury, and it argues that if there is any evidence supporting the jury's finding of a conspiracy, the finding must be upheld. *Citing Weiss v. York Hospital*, 745 F.2d 786, 814 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). TCI contends that it was selected because this was the "best" business decision for the City, even though Central offered a state-

of-the-art system with a greater number of channels and better picture quality at a lower price. TCI stresses that there would have been an interruption in service if Central had been chosen, and that the mayor and other City officials were merely responding to this eventuality. "An inference of conspiracy is not warranted where the conduct is at least as consistent with legitimate business decisions * * * as with [anti-competitive joint action]." *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir.1978).

Central contends that TCI's argument "emphasizes the innocuous and ignores the ominous." *Corey v. Look*, 641 F.2d 32, 35 (1st Cir.1981) (holding that concerted action by city officials and a parking lot operator designed to subvert normal commercial bidding and exclude the plaintiff violated Section One of the Sherman Act). Central contends that the record reveals abundant evidence that various City officials were coerced and pressured into an anti-competitive position. We find this a difficult question. Nonetheless, after reviewing the lengthy record in detail, we believe that overturning the jury's conspiracy verdict would require us to review the evidence *de novo* and to accord little respect for the verdict of what the trial judge termed was "an extremely attentive jury." *Central Telecommunications*, 610 F.Supp. at 894.

## G. Damages.

### 1. *Fact of Damage.*

TCI contends that under *Duff v. Kansas City Star Co.*, 299 F.2d 320 (8th Cir.1962), an unestablished business cannot recover for injury to "business" under section 4 of the Clayton Act. There, we stated that a plaintiff may not recover antitrust "damages by reason of loss of anticipated profits in an anticipated business." *Id.* at 323. However, this statement must be read in light of the facts in *Duff.* Duff had operated a small weekly newspaper in Kansas City, Missouri. After eight years of non-publication due to a newsprint shortage during World War II, he unsuccessfully sought to reenter the newspaper business. He claimed that his inability to start up a newspaper again was due to an attempt by defendant to monopolize the market. The district court dismissed his antitrust action on the ground he had no "business or property" which could have been injured. This Court affirmed, finding: "After eight years of non-publication appellant possessed neither business nor property, including goodwill, which could have been damaged[.]" *Id.* at 325. Stressing that Duff had not made any large capital expenditures, did not own a copyrighted name for a newspaper which had a value, and did not have subscription, advertising, or financing commitments, the Court stated that Duff "was in no different position than any stranger who might arrive in Kansas City with the desire or wish to enter the newspaper publishing field and who claimed that because of appellees' monopoly he was prevented from doing so." *Id.* at 323.

Although neither the Supreme Court nor this Court has had occasion to expound on the meaning of *Duff,* at least seven of the Circuit Courts of Appeal,[16] as well as numerous district courts,[17] and the Supreme Court by implication[18] have ruled that an

**16.** *Parks v. Watson,* 716 F.2d 646, 659–60 (9th Cir.1983); *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 475 (7th Cir.1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983); *Huron Valley Hospital Inc. v. City of Pontiac,* 666 F.2d 1029, 1033 (6th Cir.1981); *Hayes v. Solomon,* 597 F.2d 958, 973 (5th Cir. 1978), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 987–88 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Triangle Conduit & Cable Co. v. National Electric,* 152 F.2d 398, 400 (3d Cir.

1945); *Pennsylvania Sugar Ref. Co. v. American Sugar Ref. Co.,* 166 F. 254 (2d Cir.1908).

**17.** *See, e.g., Bowl America, Inc. v. Fair Lanes, Inc.,* 299 F.Supp. 1080, 1095 (D.Md.1969); *Denver Petroleum Corp. v. Shell Oil Co.,* 306 F.Supp. 289, 307 (D.Colo.1969).

**18.** *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 126–28, 89 S.Ct. 1562, 1578–79, 23 L.Ed. 1562 (1969) (On the related question of whether the plaintiff, as a condition of maintaining a treble-damage action, must prove

unestablished business can recover future lost profits under the federal antitrust laws if a sufficiently advanced state of preparation for entering a market has been achieved. For example, the same year that *Duff* was decided, the United States Court of Appeals for the Fifth Circuit rejected a contention that *Duff* established that a business in the planning stage may never recover anticipated profits under the federal antitrust laws:

> Defendant's argument necessarily presupposes that when Congress authorized treble damage suits it meant to distinguish between the rights of persons who are put out of business and the rights of persons who are kept out of business by a conspiracy. It is unreasonable to suppose that such a distinction was intended by Congress. The purpose of the antitrust laws is to promote competition and to prevent its restraint. This purpose is no less thwarted when a person who intends and is prepared to embark in trade is stopped at the outset, than it is when a going business is brought to a standstill. It is as unlawful to prevent a person from engaging in business as it is to drive him out of business. *Thomsen v. Union Castle Mail S.S. Co.*, 2 Cir., 1908, 166 F. 251, 253. The restriction which defendants would place upon the meaning of the word "business" is unwarranted in the context of its Clayton Act usage.

> \* \* \* \*

> We see no conflict in the holding of the Duff case with the decision reached here. First, the Duff case presents facts entirely different from those under consideration here. Indeed, the trial court likened the plaintiff in Duff to a stranger who might enter Kansas City "with the desire or wish" to enter the newspaper publishing field; which is to say that the "desire or wish" is all the stranger had. No property was involved. In effect, the court held that there was no established business (good will) to which the name or trademark there involved attached.

> \* \* \* \*

> [By contrast, the plaintiff here] was guilty of no lethargy or speculative assertion of a mere wish, desire or intention to engage in business. In July he bound himself by the terms of a contract, which the evidence indicates would have been in performance in December. The alleged conspiracy stopped him cold in November. It is our opinion that Young was "injured in his business or property".

*North Texas Producers Association v. Young*, 308 F.2d 235, 243 (5th Cir.1962), *cert. denied*, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963).

A respected commentator has aptly summarized the now-established majority view:

> The plaintiff will be deemed to have an existing "business" if he has an intention to do so and has made a sufficient degree of preparation toward entering the market or industry. The four elements that the courts have considered in determining the degree of intention and preparedness are:

> (1) the plaintiff's background and experience in his prospective business;

> (2) affirmative action on the plaintiff's part to engage in the proposed business;

> (3) his ability to finance the business and to purchase the necessary equipment and facilities to engage therein; and

> (4) His consummation of contracts.

10 Von Kalinowski, Antitrust Laws and Trade Regulation, § 115.02[3][i] (1986) (footnotes omitted). *See also e.g., Parks*, 716 F.2d at 660.

---

that he made a demand for the excluded product or service, the Court stated: "The issue is whether, once the embargo was lifted, Zenith wanted to enter, had the capacity to do so, and was prevented from entering by its inability to secure a patent license and by other operations of the English patent pool. Section 4 of the Clayton Act required that Zenith show an injury to its 'business or property by reason of anything forbidden in the antitrust laws.' If Zenith's failure to enter the English market was attributable to its lack of desire, its limited production capabilities, or to other factors independent of HRI's unlawful conduct, Zenith would not have met its burden under § 4." (Footnote omitted.)

We agree with the conclusion of the United States Court of Appeals for the Fifth Circuit in *North Texas Producers Association* that *Duff* is consistent with this majority view, but simply holds that Duff had not shown sufficient business or property interests to recover for injury to "business or property" under section 4 of the Clayton Act.

■ The district court tracked this view by instructing the jury that "[i]t is necessary that plaintiff cause you to believe from the evidence an intention and preparedness to enter the cable television market in order to recover for its loss in this case." TCI does not challenge this instruction on appeal. Our review of the record supports the jury's conclusion that Central had made sufficient preparations to enter the cable television business to recover for injury to "business" under section 4 of the Clayton Act. Central had experience and expertise in the cable field, had raised over $300,000 in capital with commitments of an additional $200,000 in capital, had secured financing commitments in excess of $1.5 million, had submitted detailed feasible plans for its cable system in Jefferson City and had secured the vote of the City Council for an operating franchise.

■ TCI also contends that the tortious interference verdict must be reversed because under Missouri's tortious interference law, an unestablished business cannot recover anticipated profits unless plaintiff proves past income and expenses as the basis for computing them. *Citing Coonis v. Rogers,* 429 S.W.2d 709, 713–14 (Mo. 1968). However, our review of Missouri law reveals that this argument is too extreme. A more detailed, accurate and recent description of Missouri law was provided in *Budget Rent-A-Car v. B & G Rent-A-Car,* 619 S.W.2d 832, 836–37 (Mo. App.1981), where the court wrote:

> [T]he loss of profits, whether past or future, claimed to arise out of exclusion from a market is customarily not susceptible of detailed or direct proof, and * * * unless proof of an inferential character is permitted, the result would be to immunize a defendant from the consequences of

his wrongful acts. That principle has been frequently enunciated by the Supreme Court of the United States in the context of actions to recover damages resulting from violations of the Federal antitrust laws. * * * The principle is equally applicable where the claim of lost profits arises from a violation of fiduciary obligations or breach of contract. * * *

* * * *

* * * "The assessment of damages by a trial court sitting without a jury will not be set aside unless manifestly erroneous; and may be upheld if it falls within the range of estimates given by expert witnesses."

[There has been an] evolution away from the demand for proof of certainty in damages in actions of this nature in * * * Missouri. * * * Anticipated profits were generally not recoverable. *Coonis v. Rogers,* 429 S.W.2d 709, 714 (Mo.1968), but note the further quote, " 'They [anticipated profits] may be recovered only when they are made reasonably certain of proof of actual facts, with present data for a rational estimate of their amount; and, when this is made to appear, they may be recoverable.' " * * * "[T]he law is also well settled that damages may be recovered for loss of profits due to the breach of a contract if the evidence is sufficiently certain and definite to warrant the jury in estimating their extent." * * * "It has been said, however, that the amount of estimated loss of earnings (and the same would apply to loss of prospective profits) should, in the event of uncertainty, at least be supported by the best evidence available." * * *

* * * *

* * * "Where computation of damages is made uncertain by the nature of the breach of contract, '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.' * * * [.]" [Citations omitted.]

Similarly, in *Coach House of Ward Parkway v. Ward Parkway Shops,* 471 S.W.2d 464, 472–73 (Mo.1971), the Court stated:

Defendant relies on a line of cases exemplified by *Coonis v. Rogers,* Mo., 429 S.W.2d 709, and *Anderson v. Abernathy,* Mo., 339 S.W.2d 817, for the general proposition of law to the effect that recovery of anticipated profits of a commercial business are too remote, speculative to warrant recovery except where they are made reasonably certain by proof of actual facts with present data for a rational estimate of their amount. This is and has been the rule in Missouri. However, in *Hargis v. Sample,* Mo., 306 S.W.2d 564, 569, also cited by defendant, this court in speaking of the certainty with which loss of profits must be shown said: "True, in some cases all that can be required is to produce all the relevant facts tending to show the extent of damage and one is not to be excused for a breach of contract resulting in damages simply because those damages may not be established with exact certainty. *Wright v. Ickenroth,* Mo.App., 215 S.W.2d 43, 45. It has been said, however, that the amount of estimated loss of earnings (and the same would apply to loss of prospective profits) should, in the event of uncertainty, at least be supported by the best evidence available. *Moss v. Mindlin's, Inc.,,* Mo., 301 S.W.2d 761, 773."

We believe this case comes within [this] rule * * * where if the breach exists, the experience of mankind is convincing that a pecuniary loss has occurred while at the same time the exact amount of damage is not susceptible of being ascertained with certainty.

The Court in *Coach House* then held that damages for lost profits could be recovered, on remand, on the basis of the testimony of an expert witness on the estimated loss of business due to the violation at issue.

We think this is the type of case where the damage award was based on the best evidence available, and where the estimate of loss is reasonable and thus is not too speculative under Missouri law. In sum, we hold that Central has sufficiently proved that it suffered damage to a protectable interest under the federal antitrust law and the State of Missouri's law on tortious interference with a business expectancy.

## 2. *Measure of Damages.*

TCI contends that Central's damage theory was "irrational" and overcompensatory because it allegedly failed to deduct all the "start-up" costs of the business. Central's theory was that it should receive the fair market value of the lost franchise, and this value was ascertainable through use of an "industry rule of thumb"—ten times cash flow in Central's proposed third year of operations. Central cites controlling authority that the fair market value of a business has long been a recognized measure of damages for a precluded plaintiff in antitrust cases, *see, e.g. Arnott v. American Oil Co.,* 609 F.2d 873, 887 (8th Cir. 1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Albrecht v. Herald,* 452 F.2d 124 (8th Cir.1971). *See also Affiliated Capital Corp. v. City of Houston,* 519 F.Supp. 991, 1011 (S.D.Tex. 1981), *rev'd on other grounds,* 735 F.2d 1555 (5th Cir.1984). Central also cites to *Malley-Duff & Associates, Inc. v. Crown Life Ins. Co.,* 734 F.2d 133, 148 (3d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984) where the Court approved the use of an industry rule of thumb—a multiplier times vested renewal income—to determine fair market value.

Central introduced a detailed damages study and extensive supporting testimony. The jury arrived at an actual damage amount of $10.8 million. Central points out that TCI itself suggested that the fair market value of the Jefferson City cable franchise was between $7.7 and $15 million. Although the damage award is large, we have concluded that we are obligated under controlling authority and the facts of the case to affirm. First of all, the Supreme Court has repeatedly made clear that once the fact of damage is established, the amount of damages requires a lesser degree of proof. *See, e.g., J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 565–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) ("Our willingness to accept a degree of uncertainty in these cases

rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury. * * * The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.") For example, in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969), the Court held that antitrust damages could be awarded on the basis of plaintiff's estimates of sales it could have made absent the violation:

> [D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the fact-finder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

A respected commentator has summarized the law on the measure of antitrust damages as follows:

> The amount of damages may be established by evidence of facts from which some calculation may be logically and legally inferred. If the inference upon which the award is based is reasonable, the plaintiff may recover a sum in damages even if it is merely an approximation.

10 Von Kalinowski § 115.02[2] (1986) (footnotes omitted).

Similarly, the United States Court of Appeals for the Seventh Circuit has recently reiterated, in a decision affirmed by the Supreme Court: "Because a plaintiff can seldom prove the exact amount of antitrust damages, he may sustain his burden with circumstantial evidence and estimates of damage based on reasonable assumptions." *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1242 (7th Cir.1982), *aff'd in part, rev'd in part on other grounds*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). The law of the State of Missouri is similar with respect to damages for tortious interference with business expectancy. *See, e.g., Budget Rent-A-Car*, 619 S.W.2d at 836–37.

 Central presented an estimate of damages based on reasonable industry assumptions, and the jury was entitled to infer from the evidence actual damages in an amount of $10.8 million. Our review of the award fails to reveal any error,[19] and we could reduce the award only by acting as the *de novo* fact-finder. This we may not do.

Perhaps most significantly, Central's damage study and its expert's testimony was admitted without objection. TCI failed to introduce evidence on damages, and did not argue damages in its final argument before the jury. It is apparent that TCI made a conscious decision to "go for broke," claiming that Central could simply not receive any damages at all because TCI was not liable. The jury rejected this argument and was forced to base its damage award on the evidence before it. TCI first objected to the damages award and its method of calculation in its post-trial motion. This was too late. Accordingly, the actual damages award of $10.8 million on the antitrust (before mandatory trebling) and tortious interference claims is affirmed.

---

**19.** TCI contends, in an argument not raised before the jury, that Central's damage estimate failed to adequately account for Central's start-up costs. However, our review of the damages study reveals that start-up costs of $1.6 million were accounted for. If TCI believed this figure understated start-up costs, it should have introduced evidence on this. Given that TCI failed to raise this argument before the jury, and that there is no evidence to suggest that Central's estimate is unreasonable, we assume that $1.6 million in estimated start-up costs is reasonable.

TCI also suggests in passing that Central's damages theory erroneously uses its third year of operations as the base for determining fair market value. However, TCI failed to object to this method at trial. Moreover, the third year coincided with the date of trial, and thus had a reasonable basis.

The jury also awarded $25 million in punitive damages on the tortious interference claim. TCI does not challenge this award on appeal other than contending that if the actual damages award is reversed, the punitive damages award must also be reversed. Accordingly, although the punitive damages award is large, the award was based on a jury instruction on punitive damages which was not objected to at trial or on appeal and which, in any event, accurately sets forth the law of the State of Missouri. The record reveals substantial evidence of intentional tortious conduct on which the punitive damages award was based. Accordingly, we affirm the jury's award.

Affirmed.